# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1465

_____

Veronica Alvarez,                *

                        *

          Appellant,    *

                        *   Appeal from the United States

   v.                  *   District Court for the

                        *   Southern District of Iowa.

Des Moines Bolt Supply, Inc.,  *

                        *

         Appellee.     *

_____

Submitted:  December 17, 2009
Filed:  November 17, 2010

_____

Before BYE, BEAM, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Veronica Alvarez asserts that while she was employed at Des Moines Bolt Supply, Inc. ("DMB"), she was subjected to sexual harassment from co-workers, and that the company retaliated against her when she complained about the harassment. Alvarez filed suit under Title VII and the Iowa Civil Rights Act, alleging retaliation and sex discrimination based on a hostile environment. The district court[1] granted summary judgment for DMB, and Alvarez appeals. We affirm.

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

As we are reviewing a grant of summary judgment, we describe the facts in the light most favorable to Alvarez. Alvarez was employed in the kit department of DMB's Des Moines plant, sorting nuts and bolts, from February 19, 2001, until her resignation on May 2, 2006. Beginning in September 2005, Alvarez recorded in a journal incidents of offensive conduct directed at her by non-supervisory co-workers at DMB. Her journal documented several episodes of inappropriate conduct, including occurrences involving co-worker Brad Nurnberg. Nurnberg made sexually explicit comments to Alvarez and touched her inappropriately.

Alvarez complained to DMB employees about inappropriate conduct by her co-workers on several occasions. First, at a time not specified in the record, Alvarez complained to Sharon Miller, a receptionist with human resources responsibilities, that a co-worker commented on her breasts. Miller did not recall whether she took any action in response to Alvarez's complaint.

Around November 2005, Alvarez complained to her supervisor, Jay Owens, that Nurnberg had made sexual comments to her. In response, Owens warned Nurnberg not to say anything "sexually inappropriate." Owens also claims that he reported this complaint to Dave Norem, the warehouse manager, but Norem did not recall the complaint, and stated that if he did hear the complaint, he probably did not take any action.

Alvarez later complained to Owens again that Nurnberg made inappropriate comments of a sexual nature. Owens testified that he took the same steps in response to the second complaint and talked to Nurnberg again. Nurnberg recalled Owens warning him only once.

On January 10, 2006, Alvarez complained to Owens for the first time about physical activity by Nurnberg. Alvarez told Owens that Nurnberg had "slapped her on the butt." Owens asserted that in response to this complaint, he talked to Nurnberg, and that Nurnberg denied slapping Alvarez. Owens also said that he talked to other employees about the complaint, and that one employee, Brandin Bales, said that he saw Nurnberg slap Alvarez. Owens made "a file up" and let upper management decide what to do with Nurnberg.

Nurnberg continued with similar conduct, and on January 20, 2006, Alvarez complained to her new supervisor, Clint Jubell. Alvarez told Jubell that Nurnberg was slapping her buttocks, that he called both her and her husband a "dumb ass," and that he brushed up against her and said "[o]h, Veronica, I'm going to tell that you touched my balls." Jubell asked Alvarez to put her complaint in writing.

Alvarez's written complaint contained similar allegations against Nurnberg. Alvarez stated that Nurnberg "smacks" her butt a lot, whispered sexual slurs in her ear, and called her and her husband a "dumb ass." One alleged slur was a statement by Nurnberg that "[t]o [sic] bad you have [a] 5lb [r]estriction cause I [n]eed your help to hold my 12lb penis in the [b]athroom." She also alleged that Nurnberg made sexual advances toward her, commented on her breasts, handed out a joke flyer that someone found offensive, and stood over her so that when she turned around her shoulder would rub against his penis.

DMB began to investigate Alvarez's allegations. Jubell says that within one business day of Alvarez's complaint, he met with Nurnberg and explained what Alvarez had alleged in her complaint. Nurnberg admitted making "off-colored jokes," but denied the allegations against him. In the course of his investigation, Jubell contacted Michael Thompson, the operations manager for DMB, and Thompson decided to take over the investigation. Thompson interviewed employees who worked with Alvarez in the kit department and other employees who were in the area.

DMB collected written statements from several DMB employees. Brandin Bales reported that he saw Nurnberg slap Alvarez "in the rear." Another kit department employee, Jamer Lickteig, wrote that he had overheard "dirty" jokes between the two, but at the same time said that he had not heard or seen anything "inappropriate." Damon Robinson, a DMB employee, wrote that he had seen Alvarez and Nurnberg engage in inappropriate actions toward each other, including dirty joke-telling and "smacking" of buttocks over a period of twelve to eighteen months. Kenny Sledge, who performed information technology work in the office at DMB, observed, "I have known [Nurnberg and Alvarez] to make off-color jokes towards each other and have never noticed any kind of discomfort between the two of them."

Nurnberg also contributed a statement, dated January 30, 2006, alleging that he and Alvarez had made "random sexual coments [sic] and gestures" to each other for two years prior to the complaint. He stated that the buttocks slapping was started by Alvarez and another employee as a game, and that it was introduced to him by Alvarez. Nurnberg also asserted that Alvarez often told him about her sex life, and that he was surprised about the harassment complaint, because Alvarez recently had been asking him if she could ride along with him to lunch.

After collecting witness statements, Thompson prepared a report of the investigation. Thompson's report summarized the allegations of Alvarez and Nurnberg, and some of the oral and written witness statements. The report concluded:

> Based on the statements of both Mr. Numberg [sic], and Mrs. Alvarez, and taking into account the statements of other employees, it is credible; that both employees engaged in behavior and conduct that is strictly and specifically prohibited by DMB supply company policy. Specifically; "Verbal and physical conduct of a sexual nature[.]" Based on the statements of other employees as well as Mr. Numberg's [sic] own admission, it appears that this behavior was ongoing for some time.

Company policy states that any violation will be dealt with by corrective action up to and including termination of employment.

Thompson forwarded his finished report to Gary Beane, the treasurer of DMB, and Wayne Simmer, DMB's president and one of its owners.

Thompson met with Simmer and Beane to discuss how DMB should respond to the report. Simmer suggested that both Alvarez and Nurnberg be terminated, but Thompson "didn't feel that a first-time violation where both people had been engaging in the practice deserved termination for either one of them." The company's final decision was to suspend both employees without pay for five days beginning on January 31, 2006. After the suspension, DMB transferred Nurnberg to another department, and he did not harass Alvarez again.

When Alvarez returned from her suspension, she experienced problems with other co-workers. One co-worker, Mike Sydnes, made numerous sexual advances, commented on her breasts, and grabbed her arm. Alvarez did not report these incidents to any supervisor or management employee at DMB.

Alvarez continued to work at DMB until April 29, 2006. Alvarez was scheduled to work on May 1, 2006, but she called DMB and left a message saying that she had to stay with her daughter. In a letter dated May 2, Alvarez resigned from her position at DMB. She explained that she was resigning because of "continuous sexual harassment with co-workers and the lack of action taken by Supervisors, Managers, and the owner himself." She also attached a list of incidents that she encountered in her final weeks of employment.

Alvarez filed suit against DMB, alleging sex discrimination and retaliation, under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3, and the Iowa Civil Rights Act of 1965 ("ICRA"), Iowa Code §§ 216.6, 216.11. The

district court granted summary judgment for DMB on both the state and federal claims. The court dismissed Alvarez's retaliation claims based on the suspension, because she could not show that DMB's reason for the suspension was pretext for unlawful discrimination. The court ruled that Alvarez could not prove constructive discharge because she did not notify DMB about the post-suspension harassment before she resigned. The court also granted DMB's motion for summary judgment on the discrimination claims, because DMB took prompt remedial action in response to the pre-suspension harassment that was not welcomed, and because DMB did not have knowledge of the post-suspension harassment.

## II.

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to Alvarez, the non-moving party. *Semple v. Fed. Express Corp.*, 566 F.3d 788, 791 (8th Cir. 2009). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[2]

---

[2]Consistent with our precedent, the district court concluded that the Iowa Civil Rights Act is interpreted in the same way as Title VII. *See Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 616 (8th Cir. 1997). The Supreme Court of Iowa's recent decision in *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1 (Iowa 2009), concerning Iowa Code § 216.6 suggests that not all federal and Iowa discrimination claims should be analyzed the same. *See Newberry v. Burlington Basket Co.*, No. 09-3802, 2010 WL 3746346, at *3 (8th Cir. Sept. 28, 2010). Alvarez does not argue, however, that the Iowa court has interpreted the retaliation provision of Iowa Code § 216.11 differently from the retaliation provision of Title VII, or that the Iowa court has formulated a different meaning of what constitutes a hostile work environment for purposes of a sex discrimination claim. We therefore analyze the federal and state claims together in this case.

A.

Alvarez first contends that she produced sufficient evidence to support a reasonable inference that she was suspended in retaliation for making a complaint of sexual harassment. Title VII makes it unlawful for an employer to discriminate against an employee because she has "opposed any practice made an unlawful employment practice," or has made a charge or participated in an investigation or proceeding under the statute. 42 U.S.C. § 2000e-3(a). A plaintiff must show that the protected conduct was a determinative factor in the employer's materially adverse employment action. *Van Horn v. Best Buy Stores*, 526 F.3d 1144, 1148 (8th Cir. 2008). Because the factual record was fully developed in connection with the motion for summary judgment, we address directly whether Alvarez has presented a genuine issue of material fact for trial on the ultimate question of discrimination *vel non*. *Riser v. Target Corp.*, 458 F.3d 817, 821 (8th Cir. 2006).

The key question here is whether Alvarez presented sufficient evidence to support a conclusion that DMB's proffered reason for suspending her was pretext for a retaliatory motive. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002). DMB asserted that Alvarez was suspended because she violated DMB's sexual harassment policy by engaging in prohibited "[v]erbal and physical conduct of a sexual nature." Insofar as Alvarez argues there is a genuine issue of fact about whether she actually violated company policy and thus deserved to be suspended, her argument is misdirected. As long as DMB honestly believed that Alvarez violated company policy, and acted on that basis, DMB is not liable for discrimination, even if a trier of fact would disagree with its finding. *See Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008). "If the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity." *Id.* We focus, therefore, on whether Alvarez can show that a genuine issue of material fact exists as to whether DMB suspended her because of her complaint about sexual

harassment, rather than because DMB believed that she violated company policy. *See Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 637 (8th Cir. 2000).

Alvarez claims that her complaint of harassment was a determinative factor in her suspension, because but for her complaint, DMB would not have conducted the investigation that resulted in her suspension. Filing a harassment complaint, however, does not insulate an employee from the consequences of violating company policy. *See Richey*, 540 F.3d at 784. That Alvarez's complaint was the genesis of the investigation that led to her suspension does not, in and of itself, tend to show that she was a victim of unlawful retaliation.

Alvarez also argues that DMB did not act in good faith reliance on its internal investigation, because the company had reason to believe that reports of Alvarez's misconduct were false. She highlights that Nurnberg's complaint against her arose in response to allegations filed against him, that Nurnberg changed his story about his own harassment, that she consistently denied participating in harassment, and that other co-workers did not witness Alvarez's alleged harassment. She also complains that Damon Robinson, one of the co-workers who claimed to have witnessed Alvarez's misconduct, was known to be a friend of Nurnberg, and that Thompson told Robinson that he was trying "to help the company, help [Nurnberg]." DMB responds that other witnesses supported a finding of misconduct by Alvarez, that Thompson learned that Robinson was also "tight" with Alvarez, and that Thompson and DMB ultimately disciplined Nurnberg rather than protect him.

In our view, the record does not support a reasonable inference that DMB acted with an intent to retaliate rather than based on a good faith judgment reached after its workplace inquiry. An internal investigation, like a judicial proceeding, often produces conflicting evidence and requires judgments about credibility and the weight to be given various pieces of information. That an employer must choose among competing inferences does not mean that there inevitably is a genuine issue of fact

concerning the employer's good faith. Here, DMB decided to discipline both Nurnberg and Alvarez after investigating Alvarez's complaint of harassment; Alvarez alleges retaliation. If DMB had opted instead to discipline only Nurnberg despite reports that Alvarez also engaged in misconduct, then Nurnberg might well have alleged disparate treatment based on sex. There may have been two reasonable responses for DMB under the circumstances, but an employer who investigates allegations of workplace misconduct is entitled to latitude in evaluating the information gathered, so long as the employer acts in good faith. *See EEOC v. Total Sys. Servs, Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000). The evidence here was not so lopsided as to support a reasonable conclusion that DMB was acting in bad faith when it determined that Alvarez committed misconduct.

Alvarez also complains that when Thompson summarized the written statements made by witnesses Kenny Sledge and Jamer Lickteig, he rephrased the statements to make them appear as if they accused Alvarez of harassment. This argument overstates the reasonable inferences that can be drawn from the record. Thompson's summary explains that some of the relevant information was obtained in a "verbal interview." That Thompson's summary includes information different from the statements written by the witnesses, therefore, does not demonstrate that the summary is misleading, because the summary never purported to limit its information to the written statements. Alvarez also objects that Thompson omitted all female input from his investigation report. But Thompson was not required to interview all possible witnesses, and no woman who was interviewed provided information about misconduct by Nurnberg and Alvarez.

Alvarez asserts the discriminatory attitude of one or more of the decisionmakers on her suspension supports a finding of discriminatory intent. She alleges that Wayne Simmer, the president and an owner of DMB, referred to women as "dumb skirts," commented on the appearance of a female job applicant, had sexual relationships with other employees, and demoted an employee who ended a sexual relationship with him.

She also points to the fact that Thompson was later discharged from DMB, in part for viewing sexually inappropriate websites at work. We disagree that the distasteful behavior of Simmer and Thompson supports a reasonable inference of retaliatory motive. Thompson's preference in websites is not probative of whether he tolerated sexual harassment or discouraged complaints about it. Simmer's alleged conduct and statements are unsavory if true, but the fact remains that DMB developed through Thompson's investigation evidence that Nurnberg and Alvarez violated company policy against conduct of a sexual nature. Simmer's allegedly sexist attitudes, manifested with respect to different employees in unrelated contexts, are not sufficient to show that the finding of misconduct by Alvarez was really a pretext for a retaliatory motive.

Finally, relying on *Gilooly v. Missouri Department of Health & Senior Services*, 421 F.3d 734 (8th Cir. 2005), Alvarez contends that her retaliation claim must be submitted to a jury because DMB's conclusion that she violated company policy was based solely on statements of interested witnesses. The narrow holding of *Gilooly*, however, was that a genuine issue of fact existed concerning the employer's motive when an employer's discipline was based solely on its disbelief of an employee's harassment complaint, without any independent corroboration. *Id.* at 740-41; *see also Richey*, 540 F.3d at 784-85. Here, Alvarez was disciplined after DMB reasonably concluded that an investigation showed that she committed misconduct of a sexual nature. DMB's decision was not based on its belief that Alvarez filed a false complaint.

For these reasons, the district court did not err in granting summary judgment in favor of DMB on Alvarez's retaliation claim.

B.

Alvarez also asserted a retaliation claim based on a theory of constructive discharge. She argued that her resignation was prompted by sexual harassment that continued after her suspension. To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit. *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998). An employee is not constructively discharged, however, if she quits "without giving her employer a reasonable chance to work out a problem." *Id.* Alvarez contends that the harassment she experienced throughout her employment at DMB, and DMB's failure to eradicate the harassment led to her being constructive discharge.

This claim fails, because Alvarez did not show that she notified DMB about the post-suspension misconduct and provided the company with an opportunity to remedy the problem before she resigned. Prior to Alvarez's suspension, she complained about Nurnberg's behavior. DMB investigated the complaints, suspended Nurnberg, and transferred him so he could no longer harass her. Alvarez did not make similar complaints about co-workers after she returned from her suspension. She admits that she never informed supervisors or management employees at DMB about any post-suspension harassment. Having given DMB no reasonable opportunity to remedy the problem, Alvarez cannot assert a successful constructive discharge claim. *See Coffman*, 141 F.3d at 1247.

Alvarez contends that she should be excused from the notice requirement, because she had no chance for fair treatment if she complained again about harassment. She concludes that DMB would not have treated her fairly, because the company initially ignored her complaints about Nurnberg, and then suspended her as a result of its later investigation into the complaints. "Part of an employee's obligation to be reasonable," however, "is an obligation not to assume the worst, and

-11-

not to jump to conclusions too fast." *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 473 (8th Cir. 1990) (emphasis and internal quotation omitted). That DMB may not have investigated Alvarez's initial complaints with lightning speed, or that Alvarez's complaints about Nurnberg led to the discovery of evidence that she herself violated company policy, did not excuse Alvarez from at least notifying DMB about the continued misconduct to see how the company would respond. The district court thus properly granted summary judgment in favor of DMB on Alvarez's constructive discharge claim.

## III.

Alvarez next contends that the district court erred in granting summary judgment on her sexual harassment claims. Her claim is that sexual harassment by co-workers resulted in a hostile work environment that amounted to sex discrimination in violation of Title VII. *See Vajdl v. Mesabi Acad. of Kidspeace, Inc.*, 484 F.3d 546, 549 (8th Cir. 2007). To prove such a claim, Alvarez must establish that (1) she is a member of a protected group, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, and (4) the harassment affected a term, condition, or privilege of her employment. *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005).

DMB cannot be vicariously liable for sexual harassment by non-supervisory co-workers. *See Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1123 (8th Cir. 2007). But DMB may be directly liable for its employees' actions that violate Title VII if the company "knows or should have known of the conduct, unless it can show that it took immediate action and appropriate corrective action." *Id.* (internal quotation omitted). Where an employer takes "prompt remedial action that is reasonably calculated to stop the harassment," the employer is not liable under Title VII for the underlying sexual harassment. *Id.* When an employee complains about inappropriate conduct that does not rise to the level of a violation of law, however, there is no liability for a failure to

respond. *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 521 (6th Cir. 2001) (Guy, J., opinion for the court on this point); *cf. Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) ("In the absence of conduct creating a sex-based hostile educational environment, laxity on the part of school officials in investigating an incident is not actionable under Title IX.").

## A.

Alvarez first argues the DMB should be liable for sexual harassment by Nurnberg and other co-workers that occurred before her January 10 complaint to Owens. She disputes the district court's conclusion that she welcomed the sexually-oriented comments, because she voluntarily participated in similar banter. Assuming for the sake of analysis that this dialogue was not welcomed, we conclude that summary judgment was nevertheless appropriate on other grounds.

For harassment to be actionable under Title VII, Alvarez must demonstrate that the harassment "was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment by creating an objectively hostile or abusive environment." *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir. 2003). The standards for a hostile environment are demanding, and "conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). When evaluating a hostile environment, we look at the totality of the circumstances, "including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Vajdl*, 484 F.3d at 551.

In light of our precedents defining the degree of severity that is required to demonstrate a hostile work environment, we conclude that the sexually-oriented

-13-

remarks by Alvarez's co-workers of which DMB had notice before Alvarez's complaint on January 10 did not amount to actionable sexual harassment. DMB was on notice that Nurnberg and others made sexually inappropriate comments, including about Alvarez's breasts on several occasions, and that Nurnberg told Alvarez that he was fixing a table so she could "strip dance on it."

In *Vajdl*, however, this court held that more severe co-worker misconduct did not create a hostile environment. The employee in *Vajdl* alleged that over the course of three months, one co-worker commented about her body frequently, touched the bangs of her hair, wiped water off her pant leg, repeatedly suggested she leave her boyfriend and go on dates with him, telephoned her at home, and offered to buy her a drink and give her a ride home. 484 F.3d at 551-52. A second co-worker repeatedly requested that the employee go on dates with him, and the third co-worker made inappropriate comments about her body over a two-week period. *See id.* at 551. Our court held that the employee could not "objectively support a claim of harassment so severe or pervasive as to alter a term, condition, or privilege of her employment." *Id.* at 552; *see also LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d at 1102-03; *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935 (8th Cir. 2002).

For better or worse, "Title VII does not authorize us to impose a 'general civility code.'" *Alagna*, 324 F.3d at 980 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Because the episodes of misconduct of which DMB had notice prior to January 10 did not create a hostile environment, the company is not liable under Title VII regardless of whether DMB took prompt remedial action after Alvarez's initial complaints.

## B.

DMB was later placed on notice that Alvarez was subject to physical touching and sexual comments by Nurnberg, and Alvarez contends that DMB should be liable

-14-

for this harassment. On January 10, 2006, Alvarez complained to Owens that Nurnberg had "slapped her on the butt." On January 20, 2006, Alvarez filed a written complaint with Clint Jubell, notifying DMB of many more incidents of physical touching and inappropriate comments.

"A hostile work environment is a cumulative phenomenon," and a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment. *Engel*, 506 F.3d at 1124. We assume that after Alvarez's complaint of January 10 to Owens, DMB was on notice of harassment that arose to the level of a hostile environment. We therefore do not dispute the conclusion of the partial dissent, *post*, at 18-19, that the totality of Nurnberg's actions, verbal and physical, could amount to actionable harassment. But we conclude that DMB is not liable for co-worker harassment by Nurnberg, because DMB's response was sufficient to avoid liability. If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment. *Id*. at 1123. "Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (citations omitted). Employees often must "tolerate some delay," however, so that an employer can "gauge the credibility of the complainant and the seriousness of the situation." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 988 (8th Cir. 1999)

When Alvarez complained to Owens on January 10 about physical harassment, Owens talked to Nurnberg about the complaint and Nurnberg denied it, and spoke with a co-worker, Brandin Bales, who had seen Nurnberg slap Alvarez. Owens reported this information to upper management. Ten days later, on January 20, 2006, Alvarez filed her written complaint with Jubell. Following this complaint, DMB launched an investigation that involved interviewing Alvarez's co-workers. Thompson prepared a report about the investigation and concluded that both Alvarez

-15-

and Nurnberg had violated company policy. On January 31, DMB suspended Nurnberg without pay for five days, and after the suspension, transferred him to another department and he never harassed Alvarez again.

DMB's actions were "reasonably calculated to stop the harassment." *Carter*, 173 F.3d at 702. Although Alvarez was required to tolerate some delay while DMB investigated the complaint and formulated a remedy, DMB's response effectively ended the harassment within a reasonable time. Accordingly, the district court properly granted summary judgment in favor of DMB on Alvarez's discrimination claims based on pre-suspension sexual harassment.

## C.

Alvarez next contends that the district court erred by holding that DMB was not liable for harassment that occurred after Alvarez's suspension. On this issue, the district court concluded that Alvarez failed to show that DMB knew or should have known of the post-suspension harassment and failed to take proper remedial action.

It is undisputed that Alvarez did not notify any supervisor or management employee at DMB about alleged harassment after her suspension. Alvarez asserts, however, that DMB's failure to respond to her initial complaints, and DMB's decision to suspend her after a complaint, create a jury question as to whether DMB is responsible for her failure to report post-suspension harassment.

Generally speaking, fear of retaliation is not a proper excuse for an employee's failure to report sexual harassment. *Adams v. O'Reilly Auto., Inc.*, 538 F.3d 926, 932-33 (8th Cir. 2008). "Normally bringing a retaliation claim, rather than failing to report sexual harassment, is the appropriate response to the possibility of retaliation." *Id.* at 933. In some cases, however, an employee may be excused for a delay in reporting harassment, if the employee can "demonstrate a truly credible threat of retaliation."

*Weger v. City of Ladue*, 500 F.3d 710, 725 (8th Cir. 2007) (internal quotation omitted).

Alvarez has not presented sufficient evidence to support a finding of a truly credible threat of retaliation that could excuse her failure to provide DMB notice of post-suspension harassment. DMB responded to her previous complaints about Nurnberg and disciplined him for misconduct. DMB's decision to suspend Alvarez was not based on her sexual harassment complaint, but on an investigation that revealed misconduct by Alvarez. Alvarez presents no evidence other than the prior discipline to show that DMB supervisors discouraged her from reporting harassment after her suspension. The record is thus insufficient to show that it was reasonable for Alvarez to conclude that another complaint would subject her to retaliation.

Alvarez also asserts that DMB should have been aware of the post-suspension harassment, because upper management at the company tolerated sexual misconduct and harassment at DMB was pervasive. When harassment of an employee is so severe and pervasive that an employer should know of it, the employer is charged with constructive knowledge of the harassment. *See Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008). Alvarez points to no evidence, however, that DMB was on notice of any harassment targeted at Alvarez after her suspension, and we are not persuaded that other unrelated misconduct at DMB notified the company of additional harassment aimed at Alvarez. The alleged conduct of Alvarez's co-workers was contemptible, but the evidence does not support a finding that DMB had constructive knowledge of post-suspension harassment of Alvarez, and the company cannot be directly liable for any such harassment.

\*      \*      \*

The judgment of the district court is affirmed.

BEAM, Circuit Judge, concurring and dissenting.

I concur in Parts I and II of the court's opinion. I disagree, however, with the court's conclusion that the record permits Ms. Alvarez's "hostile work environment" claim to be decided through summary judgment. "To overcome summary judgment on her hostile work environment claim [Alvarez] must present evidence from which a reasonable jury could find that [the] conduct towards her was more than merely offensive, immature or unprofessional . . . ." Henthorn v. Capitol Commc'ns, Inc. 359 F.3d 1021, 1027 (8th Cir. 2004). But, "[t]here is no bright line between sexual harassment and merely unpleasant conduct." Id. at 1026 (quotation omitted). Thus, we must look to the "totality of the circumstances" weighing "the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job." Id. The court concludes that the behavior here was not severe enough. I disagree that on the available record this can be decided by summary judgment.

Alvarez alleged (and established) that Nurnberg verbally and physically harassed her. Respecting the verbal harassment, the record shows that Alvarez was the target of sexually explicit jokes and language on several occasions including comments (1) eliciting her for sex; (2) about the size of her breasts; (3) harassing her for "touching" Nurnberg's genitals; (4) regarding a "joke flyer" which concerned Alvarez; and (5) about her inability to lift Nurnberg's male genitalia because of her weight restrictions. As concerns physical harassment, Nurnberg (1) smacked Alvarez's buttocks on several occasions; (2) stood close behind her so that her shoulder brushed his genitals; (3) pressed his genitals against her buttocks; (4) squeezed her neck; and (5) grabbed her hair. Additionally, other employees were alleged to have (1) smacked Alvarez on the buttocks; (2) pretended to smack her; and (3) grabbed her arm.

-18-

In reviewing the record, the district court seems only to have examined those actions of Nurnberg which Alvarez directly alleged in her written complaint to C. Jubell. But, as indicated, we must look to the "totality of the circumstances." Id.; see also Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 355 (8th Cir. 1997) (noting that the evidence we examine must "not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment" (quotation omitted)); Williams v. Gen. Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999) (noting that the totality of circumstances test "includes all incidents of alleged harassment"). While Alvarez may not have specifically listed all of the alleged harassment in her written employment complaint, her pleadings set forth, and she has presented evidence supporting, a number of other actions. We should consider all of these actions.

As also earlier noted, "[a] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) (internal quotation omitted). Accordingly, I believe Alvarez has established enough facts to survive summary judgment. That is because "[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Howard v. Burns Bros., Inc., 149 F3.d 835, 840 (8th Cir. 1998).

I recognize that the hostile environment factor is difficult to analyze in light of our varying jurisprudence. Compare Duncan v. Gen. Motors Corp., 300 F.3d 928 (8th Cir. 2002) (finding that a single request for a relationship, four or five isolated touching incidents, a request to draw a phallic symbol and teasing in the form of a gender-based poster were not severe enough to meet this element); with Eich v. Bd. of Regents, 350 F.3d 752 (8th Cir. 2003) (holding that several touching incidents, standing behind the plaintiff simulating a sex act, and another incident of simulating a sex act were severe or pervasive enough to affect a term or condition of

employment).  However, "[e]ach case must stand on its own circumstances."  <u>Eich</u>, 350 F.3d at 760.  In light of the fact that we analyze the facts in each case independently, I believe that Alvarez has raised a genuine issue of fact for the jury to determine whether she was subjected to conduct which affected a term or condition of her employment.  I would reverse and remand on this issue.

_____