# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-1806
_____

Nycoca Hairston

*Plaintiff - Appellant*

v.

Christine Wormuth, Secretary, Department of the Army[1]

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: April 14, 2021
Filed: July 29, 2021

_____

Before KELLY, GRASZ, and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

Nycoca Hairston, a former employee of the Pine Bluff Arsenal (the Arsenal),
sued the Secretary of the Department of the Army (the Army) under Title VII of the

---

[1]Secretary of the Army Wormuth is automatically substituted for former
Secretary of the Army Ryan D. McCarthy pursuant to Federal Rule of Appellate
Procedure 43(c)(2).

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Hairston alleges that she was subject to a hostile work environment based on sex and that the Army retaliated against her after she reported sexual harassment. The district court entered summary judgment in favor of the Army, and Hairston appeals. We affirm in part and reverse in part.

I.

On January 28, 2013, the Army hired Hairston as a general supply specialist in the Property Book Office within the Arsenal's Directorate of Logistics. Hairston's immediate supervisor was Duane Johnson, an equipment manager at the Arsenal. Her second-level supervisor was Deborah Moncrief, and her team leader was Elizabeth Blackwood. The first year of Hairston's employment was a probationary period.

Shortly after Hairston was hired, Johnson allegedly told a number of Hairston's coworkers that he thought she was "pretty" and had "a nice booty." Though Hairston was initially unaware of these comments, she says other employees informed her of them later.

Throughout the time Hairston worked at the Arsenal, many of the employees had personal and professional conflicts with one another that affected the work environment. Hairston was involved in a number of these conflicts, which, according to Johnson, became increasingly acrimonious after she joined the office. Moncrief addressed some of these issues at an employee meeting in July 2013, where she allegedly said she was "so sick and tired of you back-stabbing bitches" and accused the people present of "acting like big babies."

In addition to the broader interpersonal problems at the Arsenal, Hairston also recalls two incidents from the summer of 2013 in which Johnson directed conduct toward her that made her feel uncomfortable. On one occasion, Hairston claims that

Johnson approached her and her coworker Kae Spencer when the three were the only people in the office. According to Hairston, Johnson stood in front of their cubicles and told them they could not leave without giving him a hug. Though Spencer and Hairston complied without protest, neither wanted to hug him. The second incident took place on August 16, when Moncrief hosted a party for Arsenal employees at her house. The party took place during work hours but involved drinking, and Hairston attended along with several of her coworkers, including Johnson. Hairston alleges that at one point during this event, Johnson picked up a saltshaker and intentionally dropped it down the front of her shirt. When she asked him why he had done that, he smiled and responded, "That's the best place for it." In Hairston's recollection, Johnson seemed drunk. Hairston claims that the two were alone when this incident occurred and that no one else witnessed it, but that she told one of her coworkers what happened as she left the party.

On around August 29, Hairston talked to her coworker John Bynum about Johnson's conduct at the party. Though Bynum was an Equal Employment Opportunity (EEO) assistant at the Arsenal, Hairston did not file a formal report at that point. During Bynum's deposition, he recalled Hairston saying that Johnson had dropped a soda bottle, not a salt shaker, "down her breasts" and that she told Bynum she "could handle it and whatnot, and she didn't want to get in trouble because she was a probationary employee." Bynum recommended that she report the incident to Moncrief or to the EEO office. The following day, Bynum informed Sharon Bolden, the Arsenal's EEO manager, about the incident at the party. Bolden asked Bynum to prepare a memo about his conversation with Hairston, which he did. Bolden then brought the information to Moncrief in order to, in Bolden's words, "let her know what had happened and that she needed to take some necessary action to do an inquiry into the concern." At that point, Hairston still had not filed an EEO complaint.

Around September 4, during a meeting with Moncrief, Johnson learned that Hairston had accused him of putting a "bottle down her blouse." Johnson denied this allegation and accused Hairston of causing "chaos" in the workplace. The same day, he forwarded Moncrief an email he originally sent her several months earlier, on March 27, 2013. The March 27 email recounted an interaction Johnson had with Hairston around March 12. According to Johnson, Hairston came into his office to discuss "personal issues," including an affair she had with another employee before he began working at the Arsenal. Hairston told Johnson she was lonely and "horney"; though these comments made Johnson uncomfortable, he said he "let [them] pass." On September 5, Johnson sent Moncrief a "Memorandum for Record" listing a number of other allegations against Hairston, including that Hairston had once rubbed Johnson's arm and pressed her breasts against his back while talking to him; that Hairston complained her coworkers were jealous of her because of her looks; that Hairston had performed her work assignments unsatisfactorily and had refused training; and that other employees had complained to him about Hairston lashing out at them and causing "drama." Johnson stated that he had "been uncomfortable with Ms. Hairston since" the incident on March 12.

Over the following days, Johnson sent Moncrief multiple emails recounting other employees' allegations of unprofessional and inappropriate conduct from Hairston. In one email, he told Moncrief that two employees witnessed Hairston rubbing the leg of another employee, Larry Richardson, under the table during a meeting. In another, he attached a complaint from an employee named Kelley Dancer, who accused Hairston of threatening to hit her car after the two were involved in a dispute in the parking lot. Dancer also said Hairston gave her "bad looks" and recounted an incident in which she attempted to talk to Hairston about a "work situation" and Hairston responded by "put[ting] her hands over her ears and chant[ing] 'I'm not listening.'" According to Johnson, he sent all of these emails to Moncrief at her request.

On September 30, Moncrief called Hairston into her office for a meeting. George Whale, the Arsenal's representative from the Army's Sexual Harassment Assault Prevention Response (SHARP) program, was also there. Moncrief told Hairston what she had heard about Johnson's conduct at the party and asked whether the allegation was true. Hairston confirmed that it was. Moncrief also introduced Whale and asked Hairston if she wanted to speak with him privately, but Hairston declined. Whale told Hairston that he would report that she did not intend to go forward with a complaint. Hairston claims she chose not to go forward because she feared retaliation and would have preferred that the incident had been reported just to Whale or Bolden, not Moncrief. Hairston recalls asking Moncrief to ensure she would not be retaliated against and Moncrief telling her that there would be "no retaliation, to go talk to [Johnson] and just tell him that [she was] sorry that this ever reached this level and to blame Mr. Bynum because Mr. Bynum was the one who told [Moncrief about the incident], and to protect [herself] next time." Following the meeting, Whale emailed Colonel David Musgrave, the commander of the Arsenal, copying Bolden and Moncrief. Moncrief responded with her own summary of the meeting.

On October 1, 2013, in an unrelated incident, Hairston emailed another employee with a question about how to use Oracle. The employee directed her to Blackwood, and the next day Blackwood responded to Hairston's question. Blackwood also commented on an assignment Hairston had been given "in February as a weekly task but appears to not have been done since mid-March." Blackwood wrote, "This surprises me since I have not before had occasion to comment negatively on your performance." On October 8, 2013, Blackwood and Johnson met with Hairston for a verbal counseling regarding the weekly assignments. Hairston maintains that this verbal counseling was pretextual and not "a result of" the assignments.

Meanwhile, after receiving the emails summarizing the meeting between Whale, Moncrief, and Hairston, Colonel Musgrave and his superior at the Joint Munitions Command (JMC) determined that an outside investigator should be brought in to look into "the issues." Musgrave requested investigative support, and on October 22, David Barrington, a senior criminal investigator with the JMC, was assigned to the case. Barrington spent the following weeks investigating both Hairston's allegation that Johnson put a saltshaker down her shirt and Johnson's allegation that Hairston pressed her breasts against his back. Barrington interviewed Hairston, Johnson, Moncrief, and nine other Arsenal employees. On November 21, Barrington submitted a memorandum to Musgrave that summarized his investigation and findings. The heading identified Hairston as the "subject" of the investigation and Johnson as the "victim." Barrington concluded that the saltshaker allegation was "unfounded due to lack of evidence." On the other hand, he found that "[i]nvestigation disclosed that Ms. Hairston made sexual contact with Mr. Johnson without his consent by intentionally pressing her breasts against his back in an office area during [June] 2013." The summaries of his interviews with other employees contained in the memorandum also include other allegations of inappropriate behavior from Hairston. Barrington noted that the sworn statements he had received were "sufficient for the commander to take action regarding the associated misconduct in the workplace by Hairston." It is unclear whether Moncrief ever read Barrington's report.

On December 2, Hairston sought counseling at the EEO office regarding, among other topics, her conflicts with her coworkers and her perception that she was being retaliated against after reporting sexual harassment. Hairston also alleged that she had been subject to a hostile work environment.

A week after she sought EEO counseling, Hairston was working in her cubicle when she overheard her coworker Cindy Hahn ask another employee, Rodney Davis, whether he would be watching the Victoria's Secret fashion show that night.

According to Hairston, Johnson "interjected himself into the conversation by stating that he cannot watch – his wife will not allow him to watch the fashion show because of the noises he makes while watching." Johnson and Davis allegedly laughed at this comment. While Hairston was not part of the conversation, she found Johnson's comment inappropriate and called Whale to report it. She also sent Whale an email documenting the incident in writing. Whale consulted with the SHARP team at the JMC about how to handle the allegation and, following their guidance, instructed Moncrief to counsel Hahn, Davis, and Johnson about why their conversation was inappropriate and to document that conversation. Moncrief informed Whale when she completed the counseling.

A few days later, on December 12, 2013, Moncrief terminated Hairston's employment. In the memorandum informing Hairston of her termination, Moncrief wrote:

> The reason for this termination is inappropriate conduct that has created an offensive work environment and has had an adverse effect on morale and employee productivity within the Directorate of Logistics. . . . Your interactions with co-workers have been unprofessional and confrontational. The incidents have been continual. There have been many instances of arguments or confrontations involving you and other employees. The issue, from my perspective, is your attitude and treatment of coworkers. For example, on August 15, at a safety meeting, you stated you would hit a co-worker's car if she pulled out in front of you again. On another occasion, the same coworker tried to talk to you about a work situation, but you covered your ears and chanted "I'm not listening." This coworker reports receiving dirty looks from you as well. Your workplace attitude and conduct toward management has been unprofessional as well. You have interrupted me, told me to 'hush' and stormed in my office. Although I have had conversations with you regarding your conduct and interactions with coworkers, and I have tried to give you advice on how to interact with coworkers, your behavior persists. In addition, you have engaged in inappropriate touching of

coworkers in the workplace, including an incident where you pressed your chest against your supervisor's back and coworkers have reported witnessing you rubbing another coworker's leg under the table during a safety meeting. These incidents affect not only the employees touched, but also your coworkers who have witnessed the events.

Following her termination, Hairston again sought counseling from the EEO office. In 2018, she brought suit against the Army, alleging violations of Title VII.

II.

We review the district court's grant of summary judgment de novo, viewing all contested facts in the light most favorable to Hairston and making all reasonable inferences in her favor. See McPherson v. O'Reilly Auto., Inc., 491 F.3d 726, 730 (8th Cir. 2007). "Summary judgment is appropriate if the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id.

A.

"Title VII prohibits sexual harassment that takes the form of a hostile work environment." Paskert v. Kemna-ASA Auto Plaza, Inc., 950 F.3d 535, 538 (8th Cir. 2020). "To establish a prima fac[i]e case that she was subjected to a hostile work environment, [Hairston] must show that (1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and her protected group status; and (4) the harassment affected a term, condition, or privilege of employment." Hesse v. Avis Rent A Car Sys. Inc., 394 F.3d 624, 629 (8th Cir. 2005).[2] The Army has acknowledged that Hairston is a member of a

_____

[2]When a plaintiff's claim is based on harassment by a non-supervisory employee, she also must show that her "employer knew or should have known of the

-8-

protected group, and we assume elements two and three are also satisfied. Cf. Sheriff v. Midwest Health Partners, 619 F.3d 923, 929 (8th Cir. 2010) ("When sexual behavior is directed at a woman it raises the inference that the harassment is based on her sex." (cleaned up)).

The fourth element requires Hairston to demonstrate that the harassment she experienced was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 845 (8th Cir. 2006) (quoting Howard v. Burns Bros., 149 F.3d 835, 840 (8th Cir. 1998)). Assessing whether she has met this burden, "we look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with [her] work performance." Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420 (8th Cir. 2010) (cleaned up). Because our focus is on the "working environment," we have held that "[a]llegations of a few isolated or sporadic incidents [of harassment] will not suffice," Nitsche, 446 F.3d at 846, unless those incidents are "extremely serious," Hales v. Casey's Mktg. Co., 886 F.3d 730, 735 (8th Cir. 2018). Rather, for the purposes of Title VII, a hostile work environment is one in which the alleged harassment has "poisoned," Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003) (quoting Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999)), or "permeated," Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), the plaintiff's working conditions. See Harris, 510 U.S. at 21 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that

---

harassment and failed to take proper action." Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1195 (8th Cir. 2006). Though the parties appear to disagree on whether Johnson was Hairston's supervisor—and, if he was, whether the Army can establish an affirmative defense to liability—we need not reach this issue to resolve Hairston's claim.

is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." (cleaned up)).

In support of her claim that she was subject to a hostile work environment, Hairston points to three instances of alleged harassment: Johnson's comment to her coworkers that she had a "nice booty," the "saltshaker incident," and Johnson's remarks about the Victoria's Secret show. We take seriously Hairston's allegations and do not question that some of the conduct she has described could contribute to a hostile work environment under Title VII. See, e.g., Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 759 (8th Cir. 2003) (emphasizing "the sexual touching and sexual innuendos made in [the plaintiff's] presence over a continuous period of time" in holding that the evidence was sufficient to find sexual harassment); id. at 759 n.1 (collecting cases). But in this instance, Hairston has not demonstrated that the three incidents she cites "permeated" or "poisoned" the work environment at the Arsenal and made it a hostile one, such that it affected the terms or conditions of her employment. Cf. Baker v. John Morrell & Co., 382 F.3d 816, 828 (8th Cir. 2004) ("Conduct this court has found sufficient to establish a hostile work environment claim includes pervasive sexual innuendo and repetitive offensive touching."); Paskert, 950 F.3d at 538–39 (explaining that "some conduct well beyond the bounds of respectful and appropriate behavior is nonetheless insufficient to violate Title VII" and concluding that several sexist and sexually harassing statements made by the plaintiff's supervisor did not "meet[] the severe or pervasive standard applied by this circuit"). Because the conduct alleged here was not "severe or pervasive enough to create an objectively hostile or abusive work environment," Harris, 510 U.S. at 21, Hairston has not made her prima facie case and the Army is entitled to judgment as a matter of law.

We affirm the district court's grant of summary judgment on Hairston's hostile work environment claim.

B.

Hairston also alleges that Moncrief terminated her employment in retaliation for Hairston's sexual harassment complaint. "To survive a motion for summary judgment on a retaliation claim, [a plaintiff] either must offer direct evidence of retaliation or create an inference of retaliation under the McDonnell Douglas burden-shifting framework." Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016). Because Hairston relies on indirect evidence for her retaliation claim, we apply McDonnell Douglas. See Liles v. C.S. McCrossan, Inc., 851 F.3d 810, 818 (8th Cir. 2017). Under this framework, Hairston "bears the burden of first establishing a prima facie case of retaliation by showing that (1) she engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Id. (cleaned up). "[T]he threshold of proof necessary to establish a *prima facie* case is minimal." Gibson v. Geithner, 776 F.3d 536, 540 (8th Cir. 2015). If Hairston can make this prima facie showing, the burden shifts to the Army "to articulate a legitimate, non-retaliatory reason for the adverse action." Id. If the Army does so, the burden shifts back to Hairston to "show the [Army's] proffered reason is a pretext." Shirrell v. St. Francis Med. Ctr., 793 F.3d 881, 887 (8th Cir. 2015).

At oral argument, the Army conceded that the proximity of Hairston's complaints about Johnson to her firing suffices for her prima facie case of retaliation. Cf. Geithner, 776 F.3d at 541 ("Proximity alone can be enough to establish causation for a *prima facie* case."). And we conclude that the Army has articulated a legitimate reason for terminating her employment—namely, the "inappropriate conduct" outlined in Moncrief's memorandum to Hairston. Cf. Kempf v. Hennepin Cnty., 987 F.3d 1192, 1196–97 (8th Cir. 2021) (concluding that an employer that alleged an employee engaged in at least two instances of unprofessional and disrespectful

-11-

behavior had a legitimate reason to terminate the employee).[3]  The main issue, therefore, is whether Hairston has established a genuine dispute of material fact as to whether the Army's offered reasons were pretextual.

"Creating a genuine issue of material fact regarding pretext requires more substantial evidence than it takes to make a prima facie case because unlike evidence establishing a prima facie case, evidence of pretext and retaliation is viewed in light of the employer's justification." Yearns v. Koss Constr. Co., 964 F.3d 671, 675 (8th Cir. 2020) (cleaned up).  For example, "timing alone is not enough to establish pretext, even if it can create an inference of retaliation" for a plaintiff's prima facie case. Id. (cleaned up) (quoting Couch v. Am. Bottling Co., 955 F.3d 1106, 1109 (8th Cir. 2020)).  We have recognized "at least two routes" a plaintiff can take to "demonstrat[e] a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." Geithner, 776 F.3d at 540.  "Both of these routes, in effect, amount to a showing that the prohibited reason, rather than the proffered reason, actually motivated the employer's action." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006).  Though the burden is on the plaintiff to provide evidence of pretext, to survive summary judgment she need not definitively prove that her employer's reason for firing her was pretextual—rather, she simply must "adduc[e] enough admissible evidence to raise genuine doubt as to the legitimacy of the

---

[3]Though Hairston claims that the accusations against her are false, the "critical inquiry" at this stage of the McDonnell Douglas analysis "is not whether the employee actually engaged in the conduct for which [s]he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861–62 (8th Cir. 2009).  There is no evidence in the record suggesting that Moncrief did not believe the accusations against Hairston.

defendant's motive." Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012) (cleaned up).

Hairston has met her burden here, highlighting two aspects of the record that "raise genuine doubt as to the legitimacy" of the Army's actual motive for firing her. First, she points to the fact that most if not all of the conduct listed in the termination memorandum from December 12, 2013, had been known to Moncrief for months. On March 27, Johnson informed Moncrief that Hairston had made him feel uncomfortable by discussing her sex life with him. By July, when Moncrief called the employee meeting, she was aware of at least some of the interpersonal problems and conflicts between Hairston and her coworkers. And in September—immediately after learning about Hairston's allegations against him—Johnson sent Moncrief a series of messages describing Hairston's unprofessional treatment of her coworkers. Specifically, Johnson's emails included Dancer's account that Hairston threatened her, gave her "bad looks," and chanted "I'm not listening" when Dancer was trying speak to her, as well as the two instances of "inappropriate touching" listed in the termination memorandum. Though Moncrief relied on these incidents as the stated basis for her decision to fire Hairston, she did not actually terminate Hairston's employment until mid-December. By this time, eight months had elapsed since Johnson first informed Moncrief of inappropriate behavior from Hairston and three months had elapsed since he sent her the additional allegations—but only ten days had passed since Hairston first sought EEO counseling, and only three since she reported Johnson's Victoria's Secret comments to Whale.

Addressing the questionable progression of events here, the Army cites precedent from this circuit establishing that the timing of an adverse employment action alone cannot establish pretext. See, e.g., Geithner, 776 F.3d at 541 ("[P]roximity alone is insufficient to establish pretext."). But while this is generally true, "[w]e cannot . . . presume that fact finders view each piece of evidence in isolation," and must view evidence of pretext "in its totality." Fitzgerald v. Action,

Inc., 521 F.3d 867, 875 (8th Cir. 2008) (quoting Wallace, 442 F.3d at 1122). Recognizing this principle, we have held that "[w]here an employer tolerates an undesirable condition for an extended period of time, and then, shortly after the employee takes part in protected conduct, takes an adverse action in purported reliance on the long-standing undesirable condition, a reasonable jury can infer the adverse action is based on the protected conduct." Id. (reversing grant of summary judgment based, in part, on the fact that the defendant decided to terminate the plaintiff "days after" he engaged in protected activity but "some two and a half months after the bulk of the accumulated misconduct [listed as the reason for the termination] occurred"); see also Eliserio v. United Steelworkers of Am., Local 310, 398 F.3d 1071, 1079–80 (8th Cir. 2005) (holding that a reasonable jury could infer pretext when a company that had ignored five earlier complaints about the plaintiff demoted him based on a sixth similar complaint that followed the plaintiff's complaints about discrimination). Based on the record before us, that is just what happened here: the Army knew about and tolerated Hairston's "undesirable" behavior "for an extended period of time" but decided to act on that behavior only in the days after she complained about sexual harassment. In this situation, "a fact finder could reasonably infer [the Army] would have terminated [Hairston] sooner if accumulated misconduct had been the true motivation for [her] discharge." Fitzgerald, 521 F.3d at 876. Moncrief's prolonged inaction, followed by her sudden action in the days following Hairston's protected conduct, therefore support Hairston's claim of pretext.

Hairston's second argument is that Moncrief's decision to investigate and eventually fire her following the "saltshaker incident" but not to investigate or take action against Johnson further proves that the Army was retaliating against her. In Alvarez v. Des Moines Bolt Supply, 626 F.3d 410, we explained that "[f]iling a harassment complaint . . . does not insulate an employee from the consequences of violating company policy. That [a plaintiff's] complaint was the genesis of the investigation that led to her suspension does not, in and of itself, tend to show that she was a victim of unlawful retaliation." Id. at 417. Applying Alvarez here, the fact

-14-

that Hairston's complaint about Johnson led Moncrief to investigate allegations against Hairston and eventually fire Hairston based on the results of that investigation does not, on its own, establish that the firing was retaliatory. Nor would it have been inappropriate had Moncrief, in the face of "conflicting evidence [that] requires judgments about credibility and the weight to be given to various pieces of information," id., determined that the allegations against Johnson were unfounded and that the allegations against Hairston were supported and warranted disciplinary action.

The issue here is that although Moncrief looked into and acted on Johnson's complaints about Hairston following their September 4 meeting, there is no evidence that Moncrief conducted *any* comparable investigation into Johnson's conduct—even though Moncrief supervised both employees and they both made accusations of sexually inappropriate conduct.[4] After hearing about the "saltshaker incident" that allegedly took place in August, Moncrief met with Johnson—not Hairston—in early September to discuss what happened. At that meeting, Johnson denied the allegation and instead accused Hairston of inappropriate conduct, and Moncrief requested that he send her further information about this conduct, which he did in the days that followed (many of Johnson's allegations then formed the basis of Hairston's termination). On the other hand, Moncrief did not meet with Hairston to discuss the allegation—an allegation that an employee under Moncrief's supervision was assaulted by her immediate supervisor at a work party hosted by Moncrief—until nearly a month later and allegedly urged Hairston to apologize to Johnson for what happened. Unlike with Johnson, after this meeting, Moncrief does not appear to have looked into or sought more information about Hairston's allegations at all. This case is therefore unlike Alvarez, where we concluded that the defendant acted in good

---

[4]Musgrave authorized a separate investigation of both Johnson and Hairston, but it does not appear that Moncrief—who ultimately made the decision to fire Hairston—was involved in that decision. And though Moncrief was aware of the investigation, the parties acknowledge that there is no evidence that she read the final report.

faith when it investigated and disciplined *both* employees who filed complaints about each other. See id. While it may be that there were reasons why Moncrief pursued the accusations against Hairston and neglected Hairston's own report of sexual harassment, the record does not contain insight into what those reasons may have been. Accordingly, we conclude that Moncrief's "lopsided," id., treatment of Hairston's and Johnson's respective allegations further supports Hairston's contention that her termination was retaliatory.

Though the Army's stated explanations for firing Hairston "would have been a legitimate basis for terminating" Hairston, this "does not neutralize the probative value" of the other evidence in the record. Fitzgerald, 521 F.3d at 874. That evidence indicates that Hairston's alleged misconduct did not become an issue until immediately after she reported Johnson to the EEO and that Moncrief treated Johnson's and Hairston's allegations against each other unevenly: she gathered information from Johnson that eventually formed the basis of Hairston's termination while not pursuing any comparable investigation into Johnson's conduct. This evidence suffices to "raise genuine doubt as to the legitimacy of [the Army's] motive" for firing Hairston, Gibson, 670 F.3d at 854 (quoting Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010)), and would allow a reasonable jury to conclude that the Army unlawfully retaliated against her. Accordingly, the district court erred in granting summary judgment to the Army on the retaliation claim.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment on Hairston's hostile work environment claim, reverse summary judgment on her retaliation claim, and remand for further proceedings.

_____