STEPHANIE M. ROSE, JUDGE UNITED STATES DISTRICT COURT
Plaintiff Hannah Gustafson sues Defendants Genesco, Inc. ("Genesco") and William Pierce for violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Iowa Civil Rights Act ("ICRA"). [ECF No. 7 at 4-5]. On April 16, 2018, Genesco filed a Motion for Summary Judgment. [ECF No. 73]. Defendant Pierce joined Genesco's Motion for Summary Judgment. [ECF No. 75]. Gustafson resists Genesco's Motion for Summary Judgment. [ECF No. 81]. The parties requested oral argument, however, the Court finds this matter can be appropriately resolved without it. See LR 7(c). As explained below, Genesco's Motion for Summary Judgment is DENIED.
I. BACKGROUND
Gustafson is a resident of Warren County, Iowa. [ECF No. 8 ¶ 2]. Gustafson began working at Journeys Kidz shoe store, as a part-time sales associate, at the Jordan Creek Mall, on May 13, 2014. [ECF No. 81-2 ¶¶ 2, 5]. This was her first job and she was hired shortly after turning sixteen. [ECF No. 81-3 at 75]. Katie Jobes was the store manager at Journeys Kidz when Gustafson was initially hired. Id. at 37, 75. Genesco is a Tennessee corporation, and does business as Journeys and Journeys Kidz. [ECF No. 81-1 ¶ 1].
Genesco has an anti-harassment and discrimination policy that details procedures for reporting harassment or discrimination at its Journeys stores. [ECF No. 73-1 ¶ 11]. The policy states that employees should report all perceived incidents of illegal harassment or discrimination to their supervisor. Id. ¶ 15. The policy also states that
*1037 [i]f the employee does not feel comfortable discussing the situation with his or her supervisor or is not satisfied with the action taken by the supervisor, the employee should contact the Human Resources Department, Suite 264, Post Office Box 731, Nashville, Tennessee 37202-0731, by telephone at (615) 367-7598 or (800) 404-5370 or via email at respect@genesco.com. An individual is not require to discuss the concern with the alleged harasser. An individual is not required to discuss the concern with his or her immediate supervisor.
[ECF No. 73-2 at 199]. Genesco maintains that Gustafson electronically signed and acknowledged that she had received and reviewed Genesco's anti-harassment and discrimination policy during her orientation by inputting the last four digits of her social security number into a computer to indicate she had reviewed the policy. [ECF Nos. 73-1 ¶ 17; 81-1 ¶ 12].
However, when Gustafson was hired, Jobes filled out Gustafson's new hire paperwork for her. [ECF No. 81-3 at 75]. Jobes stood at a computer and scrolled through the information as quickly as possible. Id. Jobes would scroll to the end of a page and checkmark boxes without explaining the information or giving Gustafson a chance to read it. [ECF No. 81-3 at 75]. Jobes would then ask Gustafson for the last four digits of her social security number to enter at the appropriate prompts. Id. Jobes entered the last four digits of Gustafson's social security number for her. Id. Jobes told Gustafson the harassment policy was not important to review. Id. Gustafson had never seen the harassment policy while she worked for Genesco. Id. at 40. Other employees say they were unaware of the anti-harassment and discrimination policy. [ECF No. 81-1 ¶ 11]. Genesco maintains that copies of its anti-harassment policy were posted in various locations where Gustafson worked, but Gustafson and other employees do not remember ever seeing copies of the anti-harassment policy posted. Id. ¶ 19.
Cody Gilbert replaced Jobes as the store manager at Journeys Kidz in July 2014. [ECF No. 73-2 at 34]. On or about September 13, 2014, Gustafson was transferred from Journeys Kidz (the "Kids shoe store") to the Journeys adult shoe store (the "Adult shoe store") in the same mall. [ECF No. 73-1 ¶ 3]. Gustafson was transferred because the Adult shoe store was busier and needed the extra help. [ECF No. 81-3 at 43]. Gilbert liked Gustafson and said she was a good employee. [ECF No. 73-2 at 134-35]. Gilbert had no other problems or issues with Gustafson. Id. at 135. Gustafson's pay and position remained the same after the transfer. [ECF No. 73-1 ¶ 3]. Gilbert remained the store manager of the Kids shoe store after Gustafson was transferred to the Adult shoe store. [ECF No. 73-2 at 134-36].
At all relevant times during Gustafson's employment, Kimberly Jordan was the district manager of both the Kids shoe store and the Adult shoe store. Id. ¶ 7. Gustafson understood Jordan was the boss of all the Journeys stores and the boss of the managers of the Journeys stores. Id. Gustafson and Jordan felt comfortable with each other, and Gustafson believed she could go to Jordan with any issues or concerns. Id. ¶ 8. Jordan was also very comfortable with Gustafson and believed they had a really good relationship. Id. But Gustafson did not have Jordan's phone number while working for Genesco and did not know how to get into contact with her. [ECF No. 81-1 ¶ 8].
When Gustafson transferred to the Adult shoe store, the store manager was Tim Tasler. [ECF No. 73-2 at 136]. Gustafson did not have any issues or problems with him. Id. Then on or about March 20, *1038 2015, Genesco hired Defendant William Pierce as the store manager of the Adult shoe store to replace Tasler. [ECF No. 73-1 ¶ 6]. Pierce was twenty-six years old at this time. [ECF No. 81-2 ¶ 9]. Pierce weighs approximately 270 pounds and is about six feet tall. Id. ¶ 10. Pierce was the highest ranking supervisor that worked at the Adult shoe store, and had the authority to discipline employees under his supervision. Id. ¶¶ 13, 14. Pierce considered Gustafson to be a good employee, and was not aware of any deficiencies in her job performance. [ECF No. 81-3 at 108]. Gustafson alleges after Genesco hired Pierce as the store manager of the Adult shoe store he began to sexually harass her. Gustafson worked at the Adult shoe store for approximately twenty-four days while Pierce was the store manager. [ECF No. 81-1 ¶¶ 6, 10].
The first alleged incident of sexual harassment occurred between March 20, 2015 and March 31, 2015. [ECF No. 73-1 ¶ 23]. Gustafson alleges Pierce sent her an inappropriate text message. Id. Pierce first texted Gustafson around midnight to tell her she did a good job at work that day.[1] [ECF No. 81-3 at 165]. Gustafson responded it was no problem. Id. Pierce then said he was sorry if he woke her up, and Gustafson responded it was okay. Id. Pierce then texted Gustafson: "I think my body is just so worn out to. I worked 83 hours this week and when I left bdubs tonight I had the worst damn cramp ever in my left thigh......." Id. at 170. Pierce sent this text message at 1:10 a.m. Id. Pierce then texted "I just need a hot tub lol." Id. This message was sent at 1:11 a.m. Id. Gustafson felt very unnerved and did not respond further. Id. at 165. Gustafson was still sixteen years old at the time of the text message exchange.
The second alleged incident of sexual harassment occurred approximately in the first week of April 2015 when Pierce and *1039 Gustafson were working alone after the store had closed. [ECF No. 83-1 at 165]. During this time, Pierce bought Gustafson a coffee from Starbucks and kept insisting she drink it. Id. Pierce pressured her to drink the coffee so much Gustafson became worried he had slipped something into it. Id. Pierce also asked Gustafson some inappropriate questions. Id. Pierce asked Gustafson if she liked to party and drink alcohol. Id. Gustafson responded no and reminded Pierce she was sixteen years old. Id. Pierce asked Gustafson if she had a boyfriend, and he asked if could give her a ride home from work, despite knowing that Gustafson's mom was picking her up. Id. Pierce asked Gustafson where she lived several times. Id. Gustafson lied to Pierce about where she lived so he would not know her address and told him her mother would be picking her up. Id. Pierce also told Gustafson he had a full bar at his hotel and invited her for a drink at the hotel. Id. Gustafson answered Pierce's questions because she wanted to be nice and worked the remaining portion of her shift. [ECF No. 73-2 at 68, 70]. Pierce's behavior made Gustafson uncomfortable because she thought he wanted to get her intoxicated in his hotel room. Id. at 97. Gustafson thought Pierce's questions could have been sexual in nature and she did not want to take any chances. [ECF No. 73-2 at 90].
The third alleged incident of sexual harassment occurred after the night Gustafson worked late with Pierce. A young man entered the Adult shoe store and asked if Journeys was hiring. Id. at 71. Pierce said Journeys was hiring. Id. The young man began flirting with Gustafson, and he asked Pierce if he could work with Gustafson if he was hired. Id. at 71-72. Pierce then insinuated Gustafson was a lesbian and told the young man he would not be allowed to work with her. Id. at 72. Gustafson interpreted Pierce's statements as being sexual and defensive in nature. Id. at 91. She thought Pierce's statements were out of the ordinary and not right. Id.
Pierce's behavior drove Gustafson to ask Gilbert if she could transfer back to the Kids shoe store. Gustafson went and spoke with Gilbert twice about her issues with Pierce. Id. at 72-74, 78. Both of her conversations with Gilbert occurred after the second alleged incident of sexual harassment took place. Id. at 65, 72-74, 78, 95. Gustafson cannot recall whether her first conversation with Gilbert occurred before or after the third incident because the events occurred close in time. Id. at 70, 95. Nonetheless, Gustafson told Gilbert about the third alleged incident of sexual harassment, where Pierce called her a lesbian, before her employment with Journeys ended. Id. at 72.
The first time Gustafson spoke with Gilbert was a few days after the second incident.[2] Id. at 95. Gustafson approached Gilbert while he was working in the Kids shoe store. Id. at 136. Gustafson asked Gilbert if the Kids shoe store was hiring, and he responded yes. Id. at 73. Gustafson then asked Gilbert if she could transfer back to the Kids shoe store. Id. When Gilbert asked her why she wanted to transfer, Gustafson told him about the details of the first two alleged incidents of sexual harassment and told him she was scared. Id. at 73-74, 104. Gilbert admitted Gustafson's demeanor may have been solemn or scared. [ECF No. 81-3 at 25]. Gustafson then told Gilbert that Pierce was a creep and she felt that there were "too many inappropriate things [ ] going on." [ECF
*1040 No. 73-2 at 74, 136]. Gilbert understood this to mean Pierce was being creepy towards Gustafson in a sexual way and she was very uncomfortable being around Pierce. Id. at 137-38. Gilbert also interpreted Gustafson's statements to mean Pierce was "trying to pursue things that he shouldn't as a manager and a guy towards a female." [ECF No. 81-3 at 30]. Gilbert admits it seemed like Gustafson was reaching out for help, and Gustafson wanted to transfer to get away from Pierce. [ECF No. 73-2 at 142-43, 158]. It also appeared to Gilbert that Gustafson could not handle the way Pierce treated her. [ECF No. 81-3 at 24]. Gustafson told Gilbert she did not want to quit Journeys altogether, but she did not want to keep working at the Adult shoe store and continue to be subjected to Pierce's inappropriate behavior. [ECF No. 73-2 at 74]. Gilbert claims he did not interpret his conversation with Gustafson as a sexual harassment complaint. [ECF No. 73-1 ¶ 34].
Gilbert told her to be careful and he would speak with Pierce. [ECF Nos. 73-2 at 73; 81-3 at 166]. Gustafson said okay but only if Gilbert "made it sound like [he] was the one who wanted [her] to transfer to the kids store," because she was afraid Pierce would retaliate against her. [ECF No. 81-3 at 166]. Gustafson also, at some point, told Gilbert about the third alleged incident of sexual harassment. [ECF No. 73-2 at 72].
The next day, Pierce approached Gustafson in the back of the store and told her that she was "not going anywhere." [ECF No. 81-3 at 166]. He said, "Just don't think you're going to leave or going anywhere. You're stuck with me." Id. Pierce's tone was menacing, and his face was stern. Id. at 184. Gustafson felt scared and intimidated. Id.
A few days after her first conversation with Gilbert, Gilbert told Gustafson she would not be allowed to transfer, and that maybe she should just quit. [ECF No. 73-2 at 73]. Gilbert told Gustafson that he had spoken with Pierce and Pierce said she could not transfer. [ECF No. 81-3 at 166]. Pierce told Gilbert if Gustafson tried to transfer to another store he would fire her and make her ineligible for rehire. Id.
Gilbert claims he did not even attempt to see if it would be possible for Gustafson to transfer back to the Kids shoe store. [ECF No. 73-2 at 147]. Gilbert said he did not attempt to seek a transfer because it would create friction with him and Pierce because he would have to more thoroughly investigate Gustafson's reasons for wanting to transfer. Id. at 148. Gilbert admitted he did not want to "dig deeper" into why Gustafson was unhappy with Pierce. Id. Gilbert did not ask Gustafson any follow-up questions about her issues with Pierce. [ECF No. 81-3 at 33]. Gilbert does not believe anything would have happened if he had reported Pierce's behavior, except that he would have been retaliated against for reporting it. Id. at 27.
Gilbert also said he did not seek a transfer because transferring someone can be difficult and he would have to go over Pierce's head. [ECF No. 73-2 at 148]. Gilbert was not Pierce's or Gustafson's supervisor at the time, and he did not have the authority to independently transfer Gustafson back to the Kids shoe store. [ECF No. 81-1 ¶ 37]. Gilbert told Gustafson "not to press the issue" of transferring further, and instead suggested that maybe she should just quit. [ECF No. 73-2 at 75]. Gilbert never told Gustafson to call Human Resources or to speak with Jordan, the district manager. [ECF No. 81-3 at 184]. Gilbert did not speak with anyone else about the issue or do anything to elevate the matter further. Id. at 144. Gilbert admits *1041 in hindsight he should have done something else. Id. Genesco's Vice President of Human Resources, Angela Dunn, acknowledged that if Gustafson's complaint to Gilbert was a report of sexual harassment Gilbert should have reported it to his superiors. [ECF No. 81-3 at 15].
The fourth alleged incident of sexual harassment occurred on April 11, 2015. [ECF No. 73-1 ¶ 41]. This occurred after Gustafson spoke with Gilbert, and Gustafson did not subsequently report it to him. [ECF No. 73-2 at 85, 95, 104]. The day before, on April 10, 2015, Gustafson was helping train a new employee and accidentally sold a customer the wrong shoe. Id. at 44-45. On April 11, 2015, when Pierce found out he became mad at Gustafson, yelled at her and called her stupid. [ECF Nos. 73-2 at 45; 81-3 at 166]. Pierce told Gustafson that she should have gotten fired for the mistake. [ECF No. 73-2 at 45]. Gustafson believes she was responsible for the mistake and believed she could have been fired for it. Id. at 45-46, 79. Pierce later apologized to Gustafson and asked her to stay. Id. at 82.
At approximately 9:00 p.m. that night, Gustafson was on a ladder in the backroom so she could reach a pair of shoes. [ECF No. 81-3 at 166]. Pierce came up from behind Gustafson, slapped her buttocks, left his hand there for a moment, and said he was glad he let her wear leggings to work. Id. Pierce and Gustafson were alone when this happened. Id. at 60. Gustafson became very upset and decided to quit. Id. at 166. Gustafson grabbed the shoes and finished helping her customer. Id. She then walked into the backroom and told Pierce she was done. Id. She grabbed her things and started to walk away. Id.
Pierce screamed at Gustafson saying "Hannah! Get back here!" Id. Pierce then apologized to her and told her he was stressed and he did not want her to quit. Id. Gustafson told him no. Id. Pierce kept shouting at her and kept asking if she was going to come into work the next day. Id. Gustafson did not reply and started crying as she walked to the front of the store. Id. She did not leave immediately because she did not know what to do, but texted her mom for a ride home. [ECF No. 73-2 at 83]. Gustafson cried as she left the store and got into the car with her mom. Id. at 85. She felt embarrassed and did not tell her mom what Pierce had done. Id. Gustafson told her mother she was crying because she sold a customer the wrong shoe, and she was going to have to quit. Id. at 86. Gustafson did not return to work the next day. Id. at 166-67.
The next morning when Gustafson did not show up for her scheduled shift, Pierce called her approximately thirty times to see if she would be coming into work. Id. at 166. Initially, Gustafson was not going to answer Pierce's calls, but then she felt like she had to because Pierce called her so many times. Id. When Gustafson answered, Pierce yelled at her and said "What do you think you're doing? Get to work now!" Id. Gustafson responded, "I am done. I can't do this." Id. Pierce then told her she had fifteen minutes to "make the right decision." Id. Gustafson told him she had already made her decision. Id. at 166-67. Pierce later texted Gustafson saying "some people just aren't cut out for this." Id. at 167. Gustafson did not speak to any Genesco employee about what Pierce had done on April 11, 2015, before deciding not to return to work. [ECF No. 73-2 at 85, 104]. Approximately three weeks later, Gustafson began working at a store called Sephora, located in the same mall as the Journeys shoe stores. [ECF No. 81-1 ¶ 56]. After Gustafson started working at Sephora, Pierce walked into the store and stared at her the entire time he *1042 was there. [ECF No. 81-3 at 167]. This terrified Gustafson. Id.
Gustafson never explicitly told Pierce she thought his behavior was inappropriate or made her uncomfortable.[3] [ECF No. 73-1 ¶¶ 25, 27, 44]. Gustafson also never reported Pierce's behavior to any Genesco employee immediately after each incident. Id. ¶¶ 25, 30, 32. However, as noted above Gustafson did discuss the first three alleged instances of sexual harassment with Gilbert. Gustafson also did not contact the Human Resources Department listed in the Genesco anti-harassment and discrimination policy or report Pierce's behavior by calling the anonymous hotline. Id. ¶ 51. Further, Gustafson did not speak with Jordan, the district manager, about any of Pierce's comments or behavior before deciding not to return to work. Id. Gustafson only remembers seeing Jordan one time during the twenty-four day period Gustafson worked with Pierce. [ECF No. 81-3 at 47]. But Gustafson did know that Jordan had been working at the store a lot during this period. [ECF No. 73-1 ¶ 9].
After Gustafson did not show up for her shift on April 12, 2015, Jordan attempted to contact Gustafson about a week later to find out why she quit. [ECF No. 81-3 at 167]. When Jordan tried to obtain Gustafson's phone number from Pierce he became very defensive. [ECF No. 73-2 at 128]. Pierce wanted to know why Jordan wanted Gustafson's phone number, and became "livid when [Jordan] told him ... that [she] was going to bring her back." Id. Pierce said he did not know why Jordan would want Gustafson to work there again, and Jordan thought Pierce was "over aggressive when it came to [Gustafson]." Id. at 129.
Jordan first texted Gustafson to find out why she quit. [ECF No. 81-3 at 167]. Gustafson told her there was a problem she couldn't handle anymore. Id. Jordan then called Gustafson a few days later and asked if anything weird had happened between Pierce and her. Id. Gustafson then told Jordan about all the instances of sexual harassment. Id. Jordan told Gustafson she could work at the Valley West mall Journeys store location so she would not have to work with Pierce. Id. Jordan said Gustafson appeared terrified of Pierce after she quit. [ECF No. 81-1 ¶ 48]. Jordan knew Pierce had allegedly walked into Sephora after Gustafson quit, and Jordan offered to give Gustafson pepper spray for protection. Id. Genesco did not formally train Jordan about how to investigate reports of sexual harassment. Id. Jordan later told Gustafson she should not come back to work at Genesco because she did not think it was a healthy environment for Gustafson and because she could not ban Pierce from the stores. [ECF No. 81-3 at 84].
Pierce also allegedly harassed at least three other young women while he was the store manager at the Adult shoe store. [ECF Nos. 73-2 at 159; 81-2 ¶¶ 61-93]. Two of the women complained of sexual harassment to Genesco on May 28, 2015, and July 6, 2015. [ECF No. 81-2 ¶¶ 67, 93]. One young woman claimed Pierce made comments about her buttocks, grabbed or slapped her buttocks about twice a week for months, and told her he was glad he let her wear leggings. Id. ¶¶ 79-82. Another young woman said Pierce would text her inappropriately, call her at odd times, follow her, and make unwanted sexual advances. [ECF No. 73-2 at 159]. After these women reported Pierce, his employment *1043 for Genesco ended on July 8, 2015. Id. at 145.
On June 3, 2016, Gustafson filed this lawsuit in the Iowa District Court for Polk County. On August 26, 2016, Genesco removed the action to this Court. [ECF No. 1]. Gustafson alleges Defendants are liable for sexual harassment, sex discrimination, and retaliation in violation of the ICRA and Title VII. [ECF No. 7 at 4-5].
II. SUMMARY JUDGMENT STANDARD
Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Paulino v. Chartis Claims, Inc. , 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis , 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). Courts must view " 'the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record.' " Pedersen v. Bio-Med. Applications of Minn. , 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting Johnson v. Wells Fargo Bank, N.A. , 744 F.3d 539, 541 (8th Cir. 2014) ). To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. Celotex Corp. v. Catrett , 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). But "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324, 106 S.Ct. 2548.
III. ANALYSIS
Gustafson sues for sexual harassment, sex discrimination, and retaliation under Title VII and the ICRA. Title VII and the ICRA prohibit sex discrimination, sexual harassment, and retaliation in employment.[4] 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a) ; Iowa Code §§ 216.6(1)(a), 216.11(2) ; Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 64-68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (establishing that sexual harassment is sex discrimination and is actionable under Title VII); Lynch v. City of Des Moines , 454 N.W.2d 827, 833 (Iowa 1990) (holding that sexual harassment is a form of illegal sex discrimination under the ICRA). The Court first addresses whether Gustafson was constructively discharged because whether she was constructively discharged will have a significant impact *1044 throughout her claims. The Court will then analyze whether summary judgment is warranted on Gustafson's sexual harassment, sex discrimination, and retaliation claims.
A. Constructive Discharge
Gustafson argues she was constructively discharged to show that she suffered an adverse employment action a necessary element of her sex discrimination and retaliation claims. See Rester v. Stephens Media, LLC , 739 F.3d 1127, 1130-32 (8th Cir. 2014) ; West v. Marion Merrell Dow, Inc. , 54 F.3d 493, 497 (8th Cir. 1995). Also, if Gustafson can show she was constructively discharged then Genesco may be prevented from asserting the Ellerth / Faragher defense on her sexual harassment claims. Pennsylvania State Police v. Suders , 542 U.S. 129, 140-41, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Accordingly, Defendants argue Gustafson cannot show she was constructively discharged as a matter of law because she was never subjected to intolerable working conditions, she did not give Genesco a reasonable chance to work out any alleged issues, and she cannot show Defendants intended to force her to quit.
Generally, a plaintiff's voluntary resignation is not considered an adverse employment action. Fenney v. Dakota, Minn. & E. R. Co. , 327 F.3d 707, 717 (8th Cir. 2003). But where an employer's actions or inactions make the employee's working conditions intolerable and the employer either intended the employee to resign or could have reasonably foreseen that the employee would resign, the employee is said to have been constructively discharged, and the employee's resignation is considered an adverse employment action. Id. ; Turner v. Honeywell Fed. Mfg. & Techs., LLC , 336 F.3d 716, 724 (8th Cir. 2003), abrogated on other grounds by Torgerson v. City of Rochester , 643 F.3d 1031 (8th Cir. 2011). This is because the employee's resignation is not truly voluntary. Fenney , 327 F.3d at 717.
The burden of establishing constructive discharge is substantial and requires a plaintiff to "show more than just a Title VII violation by her employer." Phillips v. Taco Bell Corp. , 156 F.3d 884, 890 (8th Cir. 1998) ; see also Blake v. MJ Optical, Inc. , 870 F.3d 820, 826 (8th Cir. 2017), cert. denied , --- U.S. ----, 138 S.Ct. 1442, 200 L.Ed.2d 718 (2018). Whether an employee's working conditions are intolera ble is viewed from the perspective of a reasonable person in the employee's shoes. Suders , 542 U.S. at 141, 124 S.Ct. 2342. This is an objective standard that is not based on the employee's subjective feelings. Gartman v. Gencorp Inc. , 120 F.3d 127, 130 (8th Cir. 1997) ; West , 54 F.3d at 497. In addition, a court should apply a totality of the circumstances analysis when determining whether an employee's conditions were intolerable. See Faidley v. United Parcel Serv. of Am., Inc. , No. 4:13-CV-00029-JAJ-SBJ, 2015 WL 13388260, at *4 (S.D. Iowa Nov. 30, 2015) ; Mehl v. PortaCo, Inc. , 859 F.Supp.2d 1026, 1033 (D. Minn. 2012) ; Baker v. John Morrell & Co. , 249 F.Supp.2d 1138, 1174 (N.D. Iowa 2003).
Moreover, an employee has an obligation to be reasonable by not assuming the worst and resigning prematurely. Blake , 870 F.3d at 826. Accordingly, under Title VII, an employee must give his or her employer a reasonable opportunity to fix the problem before he or she can be found to be constructively discharged.[5] Id.
*1045 This is because "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." Coffman v. Tracker Marine, L.P. , 141 F.3d 1241, 1247 (8th Cir. 1998) (quoting West , 54 F.3d at 498 ). However, if an employee reasonably believes that she would have no chance of fair treatment then she is not required to give her employer a reasonable opportunity to fix the problem. Kimzey v. Wal-Mart Stores, Inc. , 107 F.3d 568, 574 (8th Cir. 1997) ; see also Haskenhoff v. Homeland Energy Sols., LLC , 897 N.W.2d 553, 596 (Iowa 2017) (noting under federal case law, "unless the employee demonstrates a reasonable belief there is no chance for fair treatment, he or she must give the employer a chance to respond before resigning due to retaliatory conduct").
First, the Court rejects Defendants' argument that Gustafson cannot show Defendants intended to force her to quit. The United States Court of Appeals for the Eighth Circuit has held that the intent element of a constructive discharge claim can be shown by proof that the employer intended to force the employee to quit or proof that the employer could have reasonably foreseen that the employee would resign because of its actions or inactions. Fenney , 327 F.3d at 717. Here, Gustafson has come forth with adequate evidence from which a jury could determine Defendants could have reasonably foreseen that she would resign as a result of their actions. The jury could make this determination because after Gustafson reported her concerns about Pierce to Gilbert, Gilbert specifically told her that maybe she should quit. [ECF No. 73-2 at 73, 75]. It is reasonable to foresee that Gustafson would quit because Gilbert essentially advised her to do so. This is especially true considering Pierce's escalating behavior, and that no action was taken to address her concerns. See Delashmutt v. Wis-Pak Plastics, Inc. , 990 F.Supp. 689, 703 (N.D. Iowa 1998) ("It is reasonably foreseeable that a person who finds all of her attempts to improve intolerable working conditions foreclosed will quit, rather than continue to suffer the intolerable conditions."). Instead, after Gustafson first reported her issues with Pierce to Gilbert, Pierce approached her the next day and told her in a menacing way that she was "not going anywhere." [ECF No. 81-3 at 166]. In addition, when Gustafson spoke with Gilbert a second time, Gilbert told her that Pierce had said she could not transfer and that if she tried to transfer he would fire her and make her ineligible for rehire. Id. Based on these facts, Pierce's harassing behavior, and his sexual assault, Defendants could have reasonably foreseen Gustafson would quit.
Second, the Court concludes when viewing the evidence in the light most favorable to Gustafson a jury could determine that a reasonable person would find Gustafson's working conditions were intolerable. Defendants principally rely on three cases to establish as a matter of law that Gustafson's working conditions were not intolerable. See [ECF No. 74-1 at 21] (citing Breeding v. Arthur J. Gallagher & Co. , 164 F.3d 1151, 1160 (8th Cir. 1999), abrogated on other grounds by Torgerson , 643 F.3d 1031 ; Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co. , 121 F.3d 416, 421 (8th Cir. 1997) ; Tidwell v. Meyer's Bakeries, Inc. , 93 F.3d 490, 496 (8th Cir. 1996). The Court finds Breeding , Summit , and Tidwell to be factually distinguishable.
*1046 In those cases, the plaintiffs argued their working conditions were intolerable because they were either not promoted, had their schedule changed, or were given a poor performance review because of their protected characteristics. Breeding , 164 F.3d at 1159-60 ; Summit , 121 F.3d at 421 ; Tidwell , 93 F.3d at 495-96. The Eighth Circuit rightly concluded in those cases that missing a promotional opportunity, having your schedule changed, or receiving a poor performance review were not the type of conditions that a reasonable person would find so intolerable the person would feel forced to resign. However, as will be discussed below the working conditions in Breeding, Summit , and Tidwell are not comparable to the present case.
The Court's review of the case law suggests this case should proceed past summary judgment. In Delph v. Dr. Pepper Bottling Co. of Paragould , 130 F.3d 349, 356 (8th Cir. 1997), the Eighth Circuit upheld a finding by the district court that the plaintiff had been constructively discharged. In Delph , the plaintiff was subjected to racial epithets on a regular basis over a two-year period, and the workplace contained a "steady barrage of racial name-calling ...." Id. at 352. Further, there was evidence the plaintiff had received a write-up for racially motivated reasons. Id. at 354. In coming to the conclusion that the plaintiff had been subjected to intolerable working conditions the Eighth Circuit first noted that the racially hostile atmosphere of the workplace was created and maintained by the plaintiff's immediate supervisors, which made their behavior more egregious. Id. at 356. The court then noted that it was "not a situation where racial jokes and innuendo were merely bandied about the workplace with no particular target," but the racially hostile language was directed at the plaintiff and in his presence. Id.
In Duncan v. General Motors Corp. , 300 F.3d 928, 931 (8th Cir. 2002), the Eighth Circuit reversed the district court's denial of a posttrial motion for judgment as a matter of law on a constructive discharge claim because the plaintiff's working conditions were not intolerable. In Duncan , the court summarized the plaintiff's working conditions in this way:
Construing the evidence in the light most favorable to [the plaintiff], she presented evidence of four categories of harassing conduct based on her sex: a single request for a relationship, which was not repeated when she rebuffed it, four or five isolated incidents of [her supervisor] briefly touching her hand, a request to draw a planter [in the shape of a man with a hole in front of the man's pants that allowed for a cactus to protrude], and teasing in the form of a poster and beliefs for an imaginary club [called the He-Men Women Hater's Club].
Id. at 935. This behavior occurred over a two-year period of time. Id. The court held that although the plaintiff's "working conditions were certainly not ideal" they "were not so intolerable as to cause a reasonable person to resign and cannot support [a] jury's findings to the contrary." Id. at 935-36.
Gustafson's conditions were arguably worse than the plaintiff's conditions in Delph because she was subjected to a physical sexual assault. In addition, like in Delph , Pierce was Gustafson's immediate supervisor, thus making his behavior more egregious. 130 F.3d at 356. Pierce also sent Gustafson, a much younger and not-yet-adult subordinate, sexually suggestive text messages late at night. Later, when Pierce and Gustafson worked together, Pierce pestered Gustafson about drinking a coffee so much she thought he had slipped something *1047 into it. Pierce asked Gustafson if she liked to party and if she had a boyfriend. Pierce invited Gustafson, an underage female, to go to his hotel room and drink alcohol with him late at night. Soon after Gustafson did not take Pierce up on his offer, Pierce essentially called Gustafson a lesbian. Then, when Gustafson asked Gilbert if she could transfer back to the Kids shoe store, her request was denied, and Gilbert failed to investigate her concerns with Pierce. See Henderson v. Simmons Foods, Inc. , 217 F.3d 612, 617 (8th Cir. 2000) (recognizing that a poorly conducted sexual harassment investigation and failing to transfer an employee are factors to consider in determining whether an employee's working conditions were intolerable).
After Gustafson ignored Pierce's advances, Pierce threatened to fire Gustafson. See id. (recognizing a threat of discharge may also support a finding of intolerable working conditions); Summit , 121 F.3d at 421 (noting a threat of termination alone cannot constitute a constructive discharge but it may be evidence used to support a finding that an employee's working conditions were intolerable). Pierce threatened to fire Gustafson for no other reason than because she wanted to transfer back to the Kids shoe store. Pierce also told Gustafson she should have been fired because she accidentally sold a customer the wrong shoe while training a new employee. This is despite the fact that Pierce testified he thought Gustafson was a good employee and he was not aware of any deficiencies in her work performance. Then, later that night, Pierce sexually assaulted Gustafson by slapping her buttocks and telling her that he was glad he let her wear leggings to work. See Mehl , 859 F.Supp.2d at 1033 (finding that slapping an employee's backside contributed to intolerable working conditions).
Moreover, these alleged instances of sexual harassment were not isolated events that occurred over many months of time, but instead occurred over a relatively short amount of time immediately after Pierce was hired as the new Adult shoe store manager. Gustafson could rightly expect Pierce's behavior would only continue. Indeed, Gustafson has come forward with evidence showing at least two other young women complained that Pierce had sexually harassed them shortly after Gustafson quit in nearly identical ways. Further, one young woman complained that Pierce had also sexually assaulted her by slapping her buttocks. Viewing the evidence in the light most favorable to Gustafson, the Court concludes a jury could determine that a reasonable person in Gustafson's shoes would find her working conditions intolerable. See E.E.O.C. v. Finish Line, Inc. , 915 F.Supp.2d 904, 911-12, 922 (M.D. Tenn. 2013) (concluding there was a genuine issue of material fact about whether an employee was subject to intolerable working conditions where a seventeen year-old employee's thirty-eight year-old supervisor hugged her constantly, touched her, poked her, and once hugged her ten times in a single shift).
Defendants next argue Gustafson cannot show she was constructively discharged because she did not give Genesco a reasonable opportunity to fix her problem before quitting. However, under Title VII, Gustafson is not required to give Genesco an opportunity to fix the problem if a person would reasonably believe she had no chance for fair treatment. See Kimzey , 107 F.3d at 574 ; see also Haskenhoff , 897 N.W.2d at 596. Viewing the evidence in the light most favorable to Gustafson, a jury could make this determination.
*1048 When Gustafson first reported her concerns to Gilbert, he told her maybe she should quit. Gustafson appeared scared. Gilbert admits he understood Gustafson's issue with Pierce to mean Pierce was being "creepy" in a sexual way. Gilbert understood Gustafson was uncomfortable being around Pierce. Despite this, Gilbert admits he did not ask Gustafson any follow-up questions and he did not want to dig deeper into why Gustafson was unhappy with Pierce. See Cherry v. Menard, Inc. , 101 F.Supp.2d 1160, 1189 (N.D. Iowa 2000) ("If an employer refuses to hear and investigate complaints, an employee could reasonably believe that the employer will make no effort to work out the problem."). Gilbert also failed to tell Gustafson to call Human Resources or Jordan, the district manager. Instead, Gilbert only spoke with one person, Pierce, Gustafson's alleged harasser. The next day after Gustafson spoke with Gilbert, Pierce told her in a menacing way she was not going anywhere. Gilbert then relayed to Gustafson that her request to transfer was denied and Pierce said if she tried to transfer he would fire her and make her ineligible for rehire. Gilbert then told her to not "press the issue anymore." [ECF No. 81-3 at 166]. Based on these comments and actions, Gustafson could reasonably believe any further reports would be met with inaction or result in her termination. Indeed, Gilbert even admits he did not believe anything would have happened if he had reported Pierce's behavior to someone else, and he might have been retaliated against for reporting it. Id. at 27.
Defendants argue Gustafson should have at the very least reported her concerns to Jordan, the district manager, before quitting. Defendants argue Jordan and Gustafson had a good relationship, and Gustafson admitted she felt like she could go to Jordan with any concerns. Defendants point out that Gustafson worked with Jordan a few days prior to quitting and never reported anything to her, and Jordan was present at some point in time at the store on April 11, 2015. Defendants argue it was unreasonable for Gustafson to not at least notify Jordan of her concerns before she quit. But this argument entirely ignores the fact that Gustafson was told she would be fired if she tried to transfer. It also ignores the fact that Gilbert told her that maybe she should just quit and not press the issue any further. The Court also notes there are genuine issues of material fact about whether Gustafson was aware Genesco's sexual harassment hotline and whether Genesco had posted the anti-harassment policy in the stores. Although there is some evidence that the policy was posted in the Adult shoe store, multiple employees do not remember seeing it posted.
Further, the Court finds the present case is distinguishable from Alvarez v. Des Moines Bolt Supply, Inc. , 626 F.3d 410, 419 (8th Cir. 2010). In Alvarez , the court rejected the plaintiff's argument that had she reported the sexual harassment she would not have any chance for fair treatment. Id. The court did so in part because when the plaintiff initially reported her sexual harassment complaints, the company remedied the problem by separating the problem employees and suspending her harasser. Id. at 418-19. Based on this the court determined she would have had a chance for fair treatment if she had reported the additional harassment. Id. Unlike in Alvarez , no action was taken to fix Gustafson's issues and instead she was threatened with termination. For all of the foregoing reasons, viewing the evidence in the light most favorable to the Gustafson, the Court concludes a jury could find she was constructively discharged under either Title VII or the ICRA.
*1049 B. Sexual Harassment Claims
Defendants argue they are entitled to summary judgment on Gustafson's sexual harassment claims because Gustafson cannot establish she was subjected to sexual harassment sufficiently severe or pervasive enough to affect a term, condition, or privilege of her employment. Second, Genesco argues it is entitled to assert the Ellerth/Faragher defense to show it is not vicariously liable for Pierce's conduct.
1. Severe and Pervasive
To establish a claim for sexual harassment under Title VII or the ICRA, a plaintiff is required to show "that she was a member of a protected group, that she was subjected to unwelcome sexual harassment, that the harassment was based on sex, and that the harassment affected a term, condition, or privilege of her employment." Duncan , 300 F.3d at 933 (quoting Beard v. Flying J, Inc. , 266 F.3d 792, 797-98 (8th Cir. 2001) ); see Haskenhoff , 897 N.W.2d at 571. Defendants only argue Gustafson cannot establish she suffered sexual harassment sufficiently severe or pervasive enough to affect a term, condition, or privilege of her employment. The Court disagrees.
As discussed above, the Court has already concluded Gustafson has made a sufficient showing so a jury could determine she was constructively discharged. Being constructively discharged would affect a term, condition, or privilege of her employment. See Burlington Indus., Inc. v. Ellerth , 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (holding a discharge constitutes a significant change in employment status); Quick v. Donaldson Co. , 90 F.3d 1372, 1378 (8th Cir. 1996) (noting a hostile work environment may exist where an employee is discouraged from remaining on the job). Therefore, having concluded Gustafson could show she was constructively discharged because of Pierce's sexually harassing behavior, she has also met her burden of showing the harassment affected a term, condition, or privilege of her employment.
In addition, the Court has considered the factors outlined in Duncan for determining whether sexual harassment is sufficiently severe or pervasive enough to affect a term, condition, or privilege of employment. See 300 F.3d at 934. Viewing the record in the light most favorable to Gustafson, the Court concludes a jury could find the sexual harassment Gustafson was subjected to was sufficiently severe or pervasive to affect a term, condition, or privilege of her employment. See Moring v. Ark. Dep't of Correction , 243 F.3d 452, 456-57 (8th Cir. 2001) (finding sexual harassing behavior sufficiently severe to alter the terms and conditions of employment where on an overnight business trip the plaintiff's supervisor showed up to her hotel room in his boxers, sat on her bed, touched her thigh, attempted to kiss her, and would not leave); Breeding , 164 F.3d at 1159 (finding sexual harassment was sufficiently severe and pervasive where a supervisor fondles his genitals in front of a female employee and uses lewd and sexually inappropriate language); Rorie v. United Parcel Service, Inc. , 151 F.3d 757, 762 (8th Cir. 1998) (finding a genuine issue of material fact on the fourth element of a sexual harassment claim where a supervisor patted the plaintiff on the back, brushed up against her, and told her she smelled good). The Court is reminded "[o]nce there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." Howard v. Burns Bros. , 149 F.3d 835, 840 (8th Cir. 1998).
2. The Ellerth/Faragher defense
Genesco next argues it is entitled to assert the Ellerth /Faragher defense to vicarious *1050 liability on Gustafson's sexual harassment claims. But Genesco is only entitled to assert the defense if Gustafson cannot show she suffered a tangible employment action. See Suders , 542 U.S. at 140-41, 124 S.Ct. 2342. In Suders , the Court held a constructive discharge can constitute a tangible employment action where the constructive discharge is precipitated by the official acts of the supervisor. Id. Therefore, Gustafson can prevent Genesco from asserting the Ellerth/Faragher defense if she can show she was constructively discharged and her constructive discharge was precipitated by official acts. As discussed above, the Court concludes a reasonable jury could find that Gustafson had been constructively discharged. Thus, Gustafson must only show her constructive discharge was precipitated by official acts.
Here, the Court finds Gustafson can adequately show that official acts precipitated her constructive discharge. First, Pierce denied Gustafson's transfer, and then threatened to terminate her and make her ineligible for rehire if she tried to transfer again. Pierce used his position as the store manager to deny Gustafson's transfer and to effectuate his threat of termination. Second, Gilbert knew Gustafson was worried Pierce was "trying to pursue things that he shouldn't as a manager and a guy towards a female." [ECF No. 81-3 at 30]. Even Genesco's Vice President of Human Resources, Angela Dunn, acknowledged that if Gustafson's complaint to Gilbert was a report of sexual harassment Gilbert should have reported it to his superiors. Id. at 15. Accordingly, the Court declines to enter judgment as a matter of law because Gustafson has come forth with sufficient evidence that if proven at trial would preclude Genesco from asserting the Ellerth /Faragher defense.
C. Sex Discrimination
The Court rejects Defendants' arguments that they are entitled to summary judgment on Gustafson's sex discrimination claims. Defendants first argue Gustafson cannot show she suffered an adverse employment action. As discussed above, Gustafson can satisfy this element by showing she was constructively discharged. Defendants then argue Gustafson cannot show she was treated differently from similarly-situated male employees. Although Gustafson has not come forth with specific examples of male employees being treated better than herself, the Court concludes she has provided sufficient proof for the jury to conclude Pierce did not and would not treat male employees the same. See Rester , 739 F.3d at 1131 (noting this analysis requires the court to determine whether a plaintiff was treated differently because of her sex or the actions of her supervisor were motivated by her sex); Moring , 243 F.3d at 456 (noting because of the supervisor's sexual remarks and actions "[a] reasonable jury could find that [the] conduct would not have been directed at a male employee").
D. Retaliation
"To establish a prima facie case of retaliation, [a plaintiff] must demonstrate that '1) she engaged in protected conduct; 2) a reasonable employee would have found her employer's retaliatory action materially adverse; and 3) the materially adverse action was causally linked to her protected conduct.' " Rester , 739 F.3d at 1132 (quoting Wilkie v. Dep't of Health & Human Servs. , 638 F.3d 944, 955 (8th Cir. 2011) ). Defendants argue Gustafson's retaliation claims fails as a matter of law because she cannot satisfy any of the elements of her retaliation claims.
1. Protected activity
Gustafson argues she engaged in a protected activity by complaining to *1051 Gilbert about Pierce. A plaintiff engages in protected conduct when he or she opposes an unlawful employment practice. 42 U.S.C. § 2000e-3(a) ; Iowa Code § 216.11(2). "[R]etaliation may occur even though the employee has not filed a 'formal complaint.' " Channon v. United Parcel Serv., Inc. , 629 N.W.2d 835, 862 (Iowa 2001). "The range of protected activity includes an employee's 'informal complaint to management.' " Id. (quoting Arzate v. City of Topeka , 884 F.Supp. 1494, 1503 (D. Kan. 1995) ). "A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law." Buettner v. Arch Coal Sales Co. , 216 F.3d 707, 714 (8th Cir. 2000). "Conduct is not actionable under Title VII if no reasonable person could have believed the incident violated Title VII's standard." Barker v. Mo. Dep't of Corr. , 513 F.3d 831, 835 (8th Cir. 2008). "When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes" protected activity. Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn. , 555 U.S. 271, 276, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) (citations omitted). A plaintiff is not required to use any magic words to alert her employer she is opposing an unlawful employment practice. Dutcher v. Mid Iowa Reg'l Hous. Auth. , No. 12-CV-3081-DEO, 2014 WL 1165856, at *14 (N.D. Iowa Mar. 21, 2014). The complaint needs to only provide enough facts to raise an inference that she was complaining of an unlawful employment practice. See Guimaraes v. SuperValu, Inc. , 674 F.3d 962, 978 (8th Cir. 2012).
When Gustafson first spoke with Gilbert, she told him she was scared and she wanted to transfer stores to get away from Pierce. Gustafson told Gilbert about the first three incidents of alleged sexual harassment. Gilbert understood Gustafson's complaint to mean Pierce was being "creepy" in a sexual way, and he was attempting to pursue Gustafson in a way he should not as her manager. Gustafson wanted to get away from Pierce so badly she told Gilbert she was contemplating quitting, but would rather transfer. Gustafson requested if Gilbert was going to speak with Pierce that he "ma[k]e it sound like [he] was the one who wanted [her] to transfer to the kids store," because she was afraid Pierce would retaliate against her. [ECF No. 81-3 at 166]. By complaining to Gilbert about Pierce's behavior and asking to transfer stores, a jury could find Gustafson complained of sexual harassment in good faith.
Moreover, a jury could find that it was reasonable for Gustafson to believe that Pierce's conduct constituted sexual harassment. Pierce, a twenty-six year-old physically imposing man, sent Gustafson, a sixteen-year old girl, a series of sexually suggestive text messages late at night. Pierce and Gustafson worked late at night where Pierce asked her if she had a boyfriend and if she like to party and drink alcohol. Pierce told her he had a full bar in his hotel room and said he would take her out for a drink if she wanted. Pierce repeatedly asked to give her a ride home. During this time Pierce badgered Gustafson to drink her coffee so much she thought he had slipped something into it. Soon after Gustafson did not take Pierce up on his offer to get a drink, Pierce essentially called Gustafson a lesbian in her presence. Defendants also appear to implicitly acknowledge Gustafson's complaint was a complaint of sexual harassment. Defendants maintain that when Gilbert spoke with Gustafson, he told her to speak with Jordan or call Genesco's anonymous *1052 sexual harassment hotline.[6] If true, this would tend to show that Gilbert did perceive Gustafson's complaint as a report of sexual harassment. Accordingly, for these reasons, the Court concludes a jury could find that it was reasonable for Gustafson to believe Pierce's conduct violated Title VII's standards.
2. Adverse employment action
Gustafson argues Defendants took adverse action against her when she was constructively discharged and when Pierce denied her transfer. As discussed above, Gustafson can show she was constructively discharged, and therefore can establish an adverse employment action. Gustafson also argues Defendants took an adverse action against her by denying her request to transfer.
In the context of a retaliation case, to prove an adverse employment action occurred a plaintiff is required to "show that a reasonable employee would have found the challenged action materially adverse, which ... means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." AuBuchon v. Geithner , 743 F.3d 638, 642 (8th Cir. 2014) (quoting Burlington N. & Santa Fe Ry. Co. v. White , 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ); See Haskenhoff , 897 N.W.2d at 587. This is a flexible standard that depends on the particular circumstances of the case and context matters. AuBuchon , 743 F.3d at 644. The purported adverse action does not have to "affect the terms and conditions of employment." Burlington Northern , 548 U.S. at 64, 126 S.Ct. 2405. But "an adverse employment action must be material, not trivial." AuBuchon , 743 F.3d at 644. "To avoid the triviality pitfall, the retaliation must produce some 'injury or harm.' " Id. (quoting Littleton v. Pilot Travel Ctrs., LLC , 568 F.3d 641, 644 (8th Cir. 2009) ). However, the Eighth Circuit has also suggested that a threat of termination after engaging in protected conduct may alone be enough to constitute an adverse employment action. See Hill v. City of Pine Bluff, Ark. , 696 F.3d 709, 715 (8th Cir. 2012) (noting the plaintiff's written warning did not threaten termination, unlike in Littleton ); Littleton , 568 F.3d at 644 (analyzing the plaintiff's retaliation claim under the causation element even though plaintiff's employment was not harmfully impacted after observing that the plaintiff was threatened with termination for allegedly engaging in protected conduct).
Here, the Court concludes a jury could find Pierce's denial of Gustafson's request to transfer constituted an adverse employment action. When Pierce spoke with Gilbert about Gustafson's request, Pierce told Gilbert that Gustafson was not allowed to transfer and if she tried to transfer to another store he would fire her and make her ineligible for rehire. [ECF No. 81-3 at 166]. A jury could find these facts would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." AuBuchon , 743 F.3d at 642 (quoting Burlington N. , 548 U.S. at 67, 126 S.Ct. 2405 ). Further, Pierce's denial of Gustafson's request to transfer was not trivial because it produced some harm or injury. Although Gustafson's pay and benefits did not change, she was forced to continue to work with Pierce whom she was so uncomfortable being around she contemplated quitting. Gustafson told Gilbert she did not want to quit Journeys altogether, but she did not want to keep working at the Adult shoe store and continue to be subject to Pierce's inappropriate behavior. [ECF No. 73-2 at *1053 74]. In addition, Gustafson was subjected to additional harassment and a sexual assault when Pierce later slapped her buttocks and told her that he was glad he let her wear leggings. Accordingly, the Court concludes Gustafson has come forth with enough evidence to show for purposes of summary judgment Pierce's denial of her request to transfer was an adverse employment action for her retaliation claim.
3. Causal connection
"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Texas Sw. Med. Ctr. v. Nassar , 570 U.S. 338, 339, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 360, 133 S.Ct. 2517. In other words, a plaintiff alleging retaliation under Title VII must show but-for her engagement in a protected activity the adverse employment action would not have occurred. See Bennett v. Riceland Foods, Inc. , 721 F.3d 546, 551 (8th Cir. 2013). However, the causation standard under the ICRA only requires the plaintiff show the protected activity was a motivating factor in the employer's decision to take adverse action against the plaintiff. Haskenhoff , 897 N.W.2d at 602, 635.
First, the Court rejects Defendants' argument that Pierce was not aware Gustafson engaged in a protected activity by complaining to Gilbert. Whether Pierce was aware that Gustafson complained to Gilbert is a genuine issue of material fact. Gustafson claims after she complained to Gilbert, Pierce approached her and told her in a menacing way she was not going anywhere. [ECF No. 81-3 at 166]. Gustafson also claims Gilbert told her that Pierce said she could not transfer and if she tried to transfer he would fire her and make her ineligible for rehire. Id. This is despite the fact that Pierce thought Gustafson was a good employee and he was not aware of any deficiencies in her work performance. Accordingly, Gustafson has come forth with sufficient proof to show that Pierce was aware of her complaint.
Second, the Court rejects Defendants' argument that Gustafson cannot show that absent her complaint to Gilbert she would not have been constructively discharged. The Court recognizes that Pierce's harassing behavior began several weeks before Gustafson complained to Gilbert. However, a jury could find that she would not have been threatened with discharge if Gustafson had not complained to Gilbert. The threat of discharge is an important piece of evidence for determining whether Gustafson was constructively discharged. See Henderson v. Simmons Foods, Inc. , 217 F.3d 612, 617 (8th Cir. 2000) (recognizing a threat of discharge may also support a finding of intolerable working conditions). If the jury would find that she was only threatened with discharge because she complained to Gilbert, then the jury might conclude absent her complaint she would not have been constructively discharged. Further, Pierce slapped Gustafson's buttocks soon after she complained to Gilbert. "Although it is not dispositive, 'the length of time between protected activity and adverse action is important' in the causation calculus." Bennett , 721 F.3d at 551 (quoting Smith v. Allen Health Sys., Inc. , 302 F.3d 827, 833 (8th Cir. 2002) ). Lastly, the Court notes that the severity of Pierce's sexually harassing behavior increased after Gustafson complained to Gilbert. Before her complaint Pierce's behavior was nonphysical. After Gustafson complained Pierce's behavior worsened and he sexually assaulted Gustafson. See *1054 White v. Metro. Gov't of Nashville , No. 3:11-CV-0607, 2013 WL 269042, at *10 (M.D. Tenn. Jan. 24, 2013) (recognizing that a genuine issue of material fact existed on the issue of causation where the retaliation occurred close in time with the protected conduct and the harassing conduct worsened after a complaint was filed). The Court therefore concludes that a reasonable jury could find but-for Gustafson's complaint to Gilbert she would not have been constructively discharged.
Gustafson also argues she suffered an adverse employment action when Pierce denied her request to transfer. When viewing the facts in the light most favorable to Gustafson, a jury could find that but-for her complaint to Gilbert, her request to transfer would not have been denied and she would not have been threatened with termination. Indeed, Defendants have not even argued Pierce denied her transfer for any other reason. After Gustafson requested to transfer, Pierce approached her the next day and told her in a menacing way she was not going anywhere and she was stuck with him. Gustafson subsequently learned from Gilbert that Pierce said if she tried to transfer again he would fire her and make her ineligible for rehire. Based on these facts, a jury could conclude but-for her complaint, Pierce would not have denied her transfer. Lastly, analyzing Gustafson's retaliation claim under the lesser motivating factor standard the Court concludes a jury could find her complaint to Gilbert was a motivating factor in her constructive discharge and Pierce's decision to deny her transfer.
IV. CONCLUSION
For the foregoing reasons, Defendants' Motion for Summary Judgment, [ECF No. 73], is DENIED.
IT IS SO ORDERED.
Dated this 8th day of June, 2018.

The Court rejects Defendants' argument that it should not rely on Gustafson's ICRC narrative contained in her Iowa Civil Rights Commission Complaint Form. The Court acknowledges that "[a] party 'may not rely on mere denials or allegations in its pleadings,' " to survive summary judgment. Lonesome Dove Petroleum, Inc. v. Holt , 889 F.3d 510, 514 (8th Cir. 2018) (quoting Barge v. Anheuser-Busch, Inc. , 87 F.3d 256, 258 (8th Cir. 1996) ). However, a party may assert a fact in opposition to summary judgment by "citing to particular parts of materials in the record, including ... affidavits or declarations ... or other materials." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).
Here, Gustafson said that she created the ICRC narrative by her telling her attorneys what happened and they wrote it down on paper. [ECF No. 81-3 at 35]. The narrative is written in the first-person from Gustafson's perspective and states facts of which she has personal knowledge. Id. at 165-67. Defendants do not argue that Gustafson is not competent. Indeed, Gustafson was deposed and both sides have relied extensively on her deposition testimony. Gustafson signed and certified under penalty of perjury that the information in the ICRC Complaint Form was true and correct. Id. at 169. Further, Gustafson said in deposition that the narrative is her words of what happened. Id. at 35. Although the narrative may have been prepared and typed up by Gustafson's attorneys and is contained in the ICRC Complaint Form, for purposes of opposing summary judgment, the Court considers it essentially no different than a declaration or affidavit. The United States Court of Appeals for the Eighth Circuit has held that the equivalent of an affidavit, such as a verified complaint, may be used to preclude summary judgment. Williams v. Adams , 935 F.2d 960, 961 (8th Cir. 1991) ("We do not believe that a litigant ... is under a duty to repeat his verified allegation in a new affidavit. Such a requirement would simply multiply the filing of paper for no good purpose." (quoting Spear v. Dayton's , 733 F.2d 554, 555 (8th Cir. 1984) ).

As noted above, the record is unclear whether this was before or after the third incident.

Although this is not surprising because he is Gustafson's alleged harasser and her supervisor.

Generally, claims under Title VII and the ICRA are analyzed similarly and without distinction. See, e.g., Pirie v. Conley Grp., Inc. , No. 4:02-CV-40578, 2004 WL 180259, at *6 (S.D. Iowa Jan. 7, 2004) (noting that a sexual harassment claim under the ICRA "is guided by federal law and federal cases"); Wensel v. State Farm Mut. Auto. Ins. Co. , 218 F.Supp.2d 1047, 1055 (N.D. Iowa 2002) ("As a preliminary matter ... in considering [plaintiff's] discrimination claims, the court will generally make no distinction between claims based on federal law and comparable claims based on state law ... because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA ...."). However, the Iowa Supreme Court has recently said "that the ICRA is not simply a knockoff of [Title VII]." Haskenhoff v. Homeland Energy Sols., LLC , 897 N.W.2d 553, 606 (Iowa 2017). The Court stressed that it is important to "recogniz[e] similarities when they appear, but also honor[ ] the differences." Id. at 607. Accordingly, where there are meaningful differences between the ICRA and Title VII the Court will address those differences, otherwise, the Court will not distinguish between them.

Under the ICRA, however, an employee is not required to give his or her employer a reasonable opportunity to fix the problem. Haskenhoff , 897 N.W.2d at 604, 652. The Iowa Supreme Court came to this conclusion in part because it reasoned that an employee should not be required to remain in intolerable working conditions just to see if his or her employer can change its behavior and come up with a remedy. Id. at 652.

Gustafson disputes this fact. [ECF Nos. 81-1 ¶ 35; 81-3 at 184].